[Crim. No. 22557. June 14, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST EDWARD CALDWELL et al., Defendants and Appellants.

212

**COUNSEL**

Michael S. Magnuson and Quin Denvir, State Public Defender, under appointments by the Supreme Court, Therene Powell, Deputy State Public Defender, and Melanie Myers for Defendants and Appellants.

Sheldon Sherman as Amicus Curiae on behalf of Defendants and Appellants.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., Carol Wendelin Pollack and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**REYNOSO, J.**—Convicted of robbery and murder,[1] defendants Ernest Edward Caldwell and Warren Edwin Washington appeal, claiming that they should not have been found guilty of the murder of a cofelon killed by police in the course of a shootout. Defendants claim that the cofelon's death proximately resulted from his own provocative conduct, for which, under our decisions, they cannot be held vicariously liable. More broadly, they wish us to reconsider the now settled rule that, though the felony-murder rule does not extend to killings by victims or police, such killings which proximately result from provocative conduct by one of the felons which exhibits a conscious disregard for life and a high probability of resulting in death constitute murder without the necessity of any "imputation" of malice. The record discloses substantial evidence of malicious conduct by the defendants themselves, and we decline their invitation to reconsider settled decisional law. Accordingly, we will affirm.

I

About 7:15 p.m. on January 28, 1980, a man wearing a gray overcoat and dark glasses, subsequently identified as Anthony Belvin (the murder victim), approached the patio window of a Church's Fried Chicken outlet and placed an order, indicating that a companion would pay. The latter was wearing a blue jacket and was later identified as defendant Washington. Washington approached the window, then walked to the rear of the building, returned to speak to Belvin, and then walked to another window as though intending to pay for the order. Belvin then revealed a sawed-off shotgun, pointed it at one of the employees, and announced a holdup. Belvin ordered the employees to lie down on the ground and forced one of them to open one of the cash registers and hand over the contents ($24). While the employee attempted to open a second register at Belvin's behest, Washington entered the building through one of the counter windows and approached the manager's office carrying a handgun. The manager was already in telephone contact with the sheriff's department, having retreated to his office when he saw the robbers (whom he thought he recognized from a previous robbery) approaching the place. When the manager failed to open his door, Washington returned to the front of the establishment and left with Belvin.

---

[1]Caldwell was found guilty of robbery (Pen. Code, § 211) (unless otherwise indicated statutory references are to the Penal Code) and second degree murder (§§ 187, 189). Washington was found guilty of robbery, possession of a sawed-off shotgun (§ 12022, subd. (a)), and first degree murder. As to each defendant, the jury found the enhancement allegation that a principal in the robbery was armed with a shotgun to be true. It found to be untrue, though, allegations that Washington personally used a shotgun in the commission of the robbery and murder (§ 12022.5).

Within seconds after the men fled, a patrol car containing Deputies Morris Boothroyd and Ronald Trujillo arrived. After one of the employees indicated in which direction the robbers had gone, Deputy Boothroyd saw a man in a blue jacket entering a brown automobile which pulled away from the curb very rapidly, so much so that the tires lost traction on the road's surface. The deputies activated their lights and siren and gave chase.

The brown car, driven without headlights, was pursued by an increasing number of patrol cars over a twisting course for 5 to 10 miles at speeds up to 70 miles per hour. During the chase, it drove through several stop signs and red lights, once skidded out of control, and nearly collided with another car. At an intersection, the suspects' auto struck a sheriff's vehicle coming from a side street and continued. Two more radio cars containing Deputies Steven Maggiora and Robert Lopez and Deputies Milkey and Bruton, joined the pursuit.

A fourth sheriff's vehicle, carrying Deputies James McSweeney and Patrick Hunter, came on the scene in front of the suspects' car, traveling in the opposite direction. The brown car initially veered toward the patrol car, then slowed almost to a stop and pulled toward the opposite curb. Suddenly the deputies noticed that the passenger in the right front seat (Washington) was pointing a shotgun at them. Instinctively, Deputy Hunter accelerated and rammed the suspects' car head-on. The shotgun discharged and flew out of Washington's hands, skidding away from the auto. Deputy Boothroyd pulled up directly behind the brown car, which rolled backward a short distance and came to rest against the patrol car's front bumper. The other sheriffs' cars parked a little behind and to the right of Boothroyd's and Trujillo's car.

The deputies alighted immediately and took cover with guns drawn. A moment later, they saw the rear-seat passenger (Belvin) lean forward and put his hand out the window with a revolver in it. At the same time, Deputy McSweeney saw the driver (defendant Caldwell) open his door and crouch behind it carrying a recognizable handgun. Deputy Hunter watched Washington as he took cover behind a door post and formed the impression that he, too, had a weapon, in view of the way he kept watching the deputy rather than seeking better cover (but it is apparently undisputed that Washington was unarmed at this point). Belvin moved his gun back and forth in a sweeping motion, ignoring repeated orders to "freeze" and "drop the gun." When Belvin took aim at two of the deputies and failed to respond to a last order to drop his weapon, Deputy Hunter fired at him, then at Washington. The rest of the deputies also fired at the car at about the same time (though Hunter is the only one of those who testified who did not state that he heard one or more shots before firing). When the shooting started,

Deputy McSweeney focused his attention on Caldwell and shot at him when, instead of dropping his gun, he looked in the direction of Mc Sweeney's partner. Estimates of the time between the ramming of the suspects' car to the firing of the first shot ranged from 5 to 40 seconds.

After the gunfire ended the suspects were removed from their vehicle. Belvin had been wounded, and he died the next morning. Tests indicated that Deputy Lopez' gun probably fired the fatal bullet. Belvin's revolver had not been fired, and Caldwell's was not found.

Both defendants testified in their own defense. Washington testified that he passed out from a PCP cigarette at Belvin's residence sometime before the robbery and could recall nothing further until he woke up in the hospital several days later. Caldwell testified that Belvin induced him to drive him and Washington to the fried chicken outlet with a promise to pay Caldwell some money he owed him. Caldwell assertedly had no idea that Belvin had committed a robbery until the police arrived and Belvin pointed the shotgun at him and threatened to shoot him if he did not drive away in an effort to elude the police.

## II

Defendants contend that their murder convictions are not supported by substantial evidence. Although the killing of their confederate, Belvin, occurred as a culmination of their unsuccessful attempt to escape after a robbery, it is conceded that the felony-murder rule has no application here since Belvin was not killed by defendants, but by a deputy sheriff in the pursuit of his duty. (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) Defendants correctly point out that they could be found guilty of murder based on such a killing only if one or both of them were shown to have intentionally committed acts which it was highly probable would result in death, manifesting a conscious disregard of human life, or malice. (*Id.*, at p. 782; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 703-705 [47 Cal.Rptr. 909, 408 P.2d 365];[2] *Taylor* v. *Superior Court*

---

[2]*Gilbert* enunciates certain basic principles governing liability for killings committed by victims or police in response to a defendant's malicious conduct:

"(1) *Proof of malice aforethought.* 'Murder is the unlawful killing of a human being, with malice aforethought.' (Pen. Code, § 187.) Such malice is implied under Penal Code section 188 when the defendant or his accomplice ' "for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." ' (*People* v. *Washington*, 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130], quoting *People* v. *Thomas*, 41 Cal.2d 470, 480 [261 P.2d 1] [concurring opinion].) Initiating a gun battle is such an act.

"(2) *The killing must be attributable to the act of the defendant or his accomplice.* When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable

(1970) 3 Cal.3d 578 [91 Cal.Rptr. 275, 477 P.2d 131].) They assert that it was Belvin's act of pointing a gun out the window of the car that precipitated the deputies' fire, and that they themselves did nothing which could be characterized as likely to result in death; since they are not liable for Belvin's malicious conduct (*People* v. *Antick* (1975) 15 Cal.3d 79, 90-91 [123 Cal.Rptr. 475, 539 P.2d 43]), they insist the murder convictions cannot stand.

Their argument fails because the major premise is inaccurate. The fundamental problem with defendants' contention is that it requires a misapplication of the "substantial evidence" rule to sustain it. ■ In reviewing a claim of insufficiency of the evidence, an appellate court " 'must view the evidence in a light most favorable to the respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) " "The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. . . .' . . . Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*Ibid.*) ■ A review of the record discloses substantial evidence of malicious conduct on the part of both defendants.

Washington's suggestion that he did not commit "any acts . . . which were likely to cause death" seems utterly fantastic. The record reflects that

response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life. [¶] Thus, the victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice. (See Hart and Honore, Causation in the Law, pp. 296-299; Hall, General Principles of Criminal Law (2d ed.) pp. 270-281.)

"(3) *Vicarious criminal liability.* Under the rules defining principals and criminal conspiracies, the defendant may be guilty of murder for a killing attributable to the act of his accomplice. To be so guilty, however, the accomplice must cause the death of another human being by an act committed in furtherance of the common design. (*People* v. *Schader,* 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Boss,* 210 Cal. 245, 249 [290 P. 881]; *People* v. *Ferlin,* 203 Cal. 587, 597 [265 P. 230].)

"(4) *The application of Penal Code section 189.* When murder is established under Penal Code sections 187 and 188 pursuant to the principles defined above, section 189 may properly be invoked to determine the degree of that murder. Thus, even though malice aforethought may not be implied under section 189 to make a killing murder unless the defendant or his accomplice commits the killing in the perpetration of an inherently dangerous felony (*People* v. *Washington,* 62 Cal.2d 777, 780-783 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Ford,* 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]), when a murder is otherwise established, section 189 may be invoked to determine its degree." (63 Cal.2d at pp. 704-705.)

he pointed a shotgun at Deputies Hunter and McSweeney as their patrol car approached from the front and was, from all that appears, prevented from shooting them only by Hunter's reflexive acceleration and ramming of the suspects' automobile. In fact, as previously noted, the shotgun discharged at about the moment of impact, though no one was hit, and it flew out of Washington's hands and skittered across the pavement. (Washington's more plausible argument that, malicious or not, his action with the shotgun was not a proximate cause of the subsequent shooting is considered, *infra.*)

Caldwell does not dispute the testimony that he drove the getaway car without headlights on a rainy evening at speeds up to 70 miles per hour and passed through a number of stop signs and red lights, losing control more than once and colliding with other cars. In view of the jury's implicit rejection of his duress defense, this in itself could constitute substantial evidence of malice. (See *People* v. *Fuller* (1978) 86 Cal.App.3d 618, 628-629 [150 Cal.Rptr. 515]; see also *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279].) (Again, a more serious issue of proximate causation remains to be discussed.)

Beyond that, though, there is Deputy McSweeney's testimony that, after the car was finally stopped (by a head-on collision with the car in which the deputy was riding) and Washington lost the shotgun, there was movement in the car, after which Caldwell exited the car and took a position of cover behind the door post with a gun in his hand, and then proceeded to ignore various commands to drop his gun, just as Belvin was doing. When the shooting started, McSweeney fired at Caldwell in response to the latter's fixing his attention on McSweeney's partner's position. The jury could reasonably infer that by the foregoing conduct Caldwell and Belvin manifested a concerted determination not to surrender and a readiness instead to shoot it out with their pursuers. In *People* v. *Reed* (1969) 270 Cal.App.2d 37 [75 Cal.Rptr. 430], the defendant was held to have initiated a gun battle by pointing his gun toward a policeman and toward the robbery victim, the appellate court remarking that "[s]uch aggressive actions required immediate reaction unless an officer is to be held to the unreasonable requirement that an armed robber be given the courtesy of the first shot." (*Id.,* at p. 45.) Although Caldwell was not given a chance to do more than look toward Deputy Hunter's position, the jury could reasonably conclude that he had already, by emerging from the car with a gun and taking cover and then refusing to drop the gun, exhibited unambiguously his aggressive intentions, so that it was plain to Deputy McSweeney, observing him, that when Caldwell looked toward McSweeney's partner, it was because he was about to fire at him.

Recognizing the damaging effect of Detective McSweeney's testimony, defendants diffidently suggest that we simply ignore it since none of the

other deputies who testified saw the gun, and it was not found at the scene. While the lack of corroboration undoubtedly might have affected the weight of the witness' testimony, it cannot be said that the fact that no gun was found renders it "physically impossible" or "inherently improbable." (*People* v. *Pearson* (1969) 70 Cal.2d 218, 221 [74 Cal.Rptr. 281, 449 P.2d 217]; *People* v. *Lyons* (1956) 47 Cal.2d 311, 319-320 [303 P.2d 329]; *People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].) We note that three of the officers involved, including Deputy Lopez whose gun probably fired the fatal bullet, did not testify at trial. The incidents in question occurred on a rainy winter evening, so a handgun thrown away some distance from the suspect's car might conceivably have been missed.

 The question remains whether the killing of Belvin was "attributable" to the malicious acts of either or both of the defendants—i.e., whether it *proximately resulted* from said conduct. (See *Pizano* v. *Superior Court* (1978) 21 Cal.3d 128, 136-138 [145 Cal.Rptr. 524, 577 P.2d 659]; see also *People* v. *Gilbert, supra,* 63 Cal.2d at pp. 704-705.) Defendants insist that Belvin's actions, ignoring the commands to drop his gun, and aiming at two deputies, were the sole cause of his death, but for which the officers would not have fired. All of the deputies who testified cited Belvin's actions as forming at least part of their reasons for opening fire. The jury might have concluded on the evidence that there was more than one proximate cause of the killing, however.

A difficult problem is presented when we examine the causal relationship between Caldwell's dangerous getaway driving and Washington's malicious and provocatory act of aiming a shotgun at Deputies Hunter and McSweeney and the shootout that followed. On one hand, it is undisputed that the deputies did not begin firing immediately, but gave the robbers a chance to surrender. Two of the four deputies who testified, Boothroyd and Maggiora, specifically testified that Washington's act was not a motivating factor in their decisions to fire. Deputy McSweeney stated that Caldwell's actions *after* the car stopped were the reason he fired. Though Deputy Hunter was concerned that Washington might have rearmed himself, even he did not cite the aiming of the shotgun as one of his reasons for opening fire. Therefore, to conclude that Caldwell's driving or Washington's act was a "but for" cause of Belvin's death might require some rather heroic inferences on the part of the jury. On the other hand, as little as five or six seconds may have elapsed between the collision and Washington's dropping of the shotgun and the deputies' opening fire. Though the deputies did not begin firing immediately, but gave the suspects an opportunity to drop their guns, it can hardly be said that whatever provocative force the high-speed chase and Washington's apparent attempt to shoot two policemen may have had dissipated, or "come to rest in a position of apparent safety." (Perkins &

Boyce, Criminal Law (3d ed. 1982) at pp. 790-781.) The lull in the action was precarious and short-lived, and at least one deputy, Boothroyd, did count the chase and the fact that Washington had "produced" a weapon a few seconds before among his reasons for fearing for his and his compatriots' safety just after the suspects' car was stopped.[3] Thus, a reasonable trier of fact could have concluded that the officers' lethal response was provoked by a violent confrontation which was the product of the actions of both Caldwell and Washington, as well as those of Belvin.[4]

The jury might also reasonably have inferred that Belvin would have been unwilling to provoke a gun battle if Caldwell had not similarly adopted an aggressive stance, refusing to drop his gun. It may have concluded that the co-felons' conduct reflected a common determination not to surrender, and the several acts of resistance were interdependent. Caldwell's acts may thus also have been a "but for" cause (in fact) of the gun battle and Belvin's death.

To be considered a *proximate* cause of Belvin's death, the acts of the defendants must have been a "substantial factor" contributing to the result. (See *People* v. *Scola* (1976) 56 Cal.App.3d 723, 726 [128 Cal.Rptr. 477]; Perkins & Boyce, Criminal Law, *supra*, at pp. 779-780; see also *People* v. *Vernon* (1979) 89 Cal.App.3d 853, 864 [152 Cal.Rptr. 765] [a number of defendants concurrently contributed to victim's death by kicking].) "[N]o cause will receive juridical recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result. This is merely a

---

[3]Washington suggests that a determination that his aiming of the shotgun was a proximate cause of Belvin's death would be inconsistent with the jury's finding that the enhancement allegation that he used a shotgun in the commission of the murder was not true. They can be reconciled. The jury may have decided that Washington was prevented from "using" the shotgun when the patrol car rammed the suspects' vehicle and it flew out of his hands. This seems consistent with the jury's acquittal of defendants on the charges of assault with a deadly weapon on Deputies Hunter and McSweeney. It is true that a criminal can "use" a gun merely by displaying it, but that was evidently not what Washington had in mind; merely displaying it would have served no purpose—i.e., would have been "use"-less—in the circumstances.

The record of defendants' motions for new trial indicates that the prosecution, the defense and the court at that point proceeded on the theory that if one of the defendants committed a malicious and provocative act, Washington did so by brandishing the shotgun. The trial court rejected Washington's argument that the verdicts against him were fatally inconsistent. The court concluded that the jury could reasonably have found the evidence to show that Washington provoked the gun battle by pointing the shotgun at the officers, but that there was no proof beyond a reasonable doubt that Washington caused the gun to discharge by pulling the trigger.

[4]The dissenting opinion emphasizes a lack of testimony that either Washington's brandishing of the shotgun or Caldwell's reckless driving motivated the deputies to open fire. Boothroyd's testimony, however, shows that he believed these actions endangered the lives of the officers.

special application of the general maxim—'*de minimis non curat lex*' . . .'' (Perkins & Boyce, *supra,* at p. 779.) The fact that one of the deputies who testified was primarily concerned about Caldwell's actions after the car stopped and their inferential importance to Belvin, and that another reacted to Washington's brandishing of the shotgun, militate in favor of recognizing said acts as a substantial factor in bringing about the gun battle and Belvin's death.

Decisions in cases involving conduct of more than one co-felon acting in concert reflect the settled view that the extent of an individual's contribution to the resulting death need not be minutely determined.

Thus, in *In re Tyrone B.* (1976) 58 Cal.App.3d 884 [130 Cal.Rptr. 245], the defendant and an accomplice (the victim) entered a store intending to rob it. The accomplice hit the clerk in the head with a shovel handle, and the defendant shoved him into a display stand and stabbed him. As the accomplice continued to beat him, the clerk produced a pistol and killed him. The appellate court rejected a claim that the accomplice's actions were the sole cause of his death, finding it sufficient that the defendant actively participated with his confederate in a simultaneous assault on the clerk. (*Id.,* at pp. 888-890.)

Similarly, in *People v. Velasquez* (1975) 53 Cal.App.3d 547 [126 Cal.Rptr. 11], it did not matter that the defendant's brother (the deceased) was not shot until he directly indicated, in response to repeated warnings, that he would not stop beating the deputy's partner. The altercation began when the defendant resisted an arrest, and his brother soon appeared to try to rescue him. They managed to relieve both deputies of their batons and together set to beating one of the deputies senseless. The other, after repeated warnings to stop, shot the defendant's brother. The appellate court stated that the latter did not alone cause his death; the defendant's acts in initially resisting arrest and his participation in the assault on one of the deputies constituted malicious conduct.

Finally, and most helpfully, in *People v. Claflin* (1978) 87 Cal.App.3d 1 [150 Cal.Rptr. 693], an order setting aside under section 995 a portion of an information charging defendants with murder and attempted murder was reversed on the basis of the appellate court's rejection of the superior court's characterization of the defendants as essentially "peripheral." Although their confederate who was killed was apparently the main motive force behind the confrontation which ended in his death, the court found sufficient evidence of malicious conduct by the defendants. After an initial altercation involving the three defendants and the deceased, one Moats, on one side, and two off-duty deputy sheriffs on the other, which arose out of a rock-

throwing incident and culminated in one of the deputies having to draw his gun, the deceased withdrew with the defendants, asking whether he should get his gun. The deputies called the police. Before they arrived, the defendants and Moats returned, the latter taking up a position behind a truck, aiming at one of the deputies, and the defendants charged him. The deputy sidestepped a blow by one of them and shot another who tried to take his gun, then shot Moats before the latter could shoot him. The appellate court held that inasmuch as all the defendants charged the deputy knowing that he and Moats both had guns, "each of them was engaging in conduct indisputably provocative of potentially lethal gunfire." (*Id.*, at p. 6.) Their conduct in attacking the deputy "set the stage for the shootout that followed," and, critically, the court found the inference reasonable "that Moats would not have charged the [deputies'] location and attempted such a potentially dangerous confrontation had the defendants not accompanied him. . . ." (*Ibid.*)

The foregoing instructive decisions persuade us that defendants' malicious conduct of fleeing in a dangerous high-speed chase, confronting the officers with a dangerous weapon when the chase ended and further preparing to shoot it out with the deputies was a proximate cause of Belvin's death. ■ Moreover, all of these acts were reasonably in furtherance of the robbery, as their evident purpose was to permit the robbers to escape. ■ ■ ■ ■ Consequently, the evidence supports a determination that Caldwell and Washington were liable for the murder of Belvin.[5]

Defendants invite us fundamentally to reconsider the *Washington-Gilbert* doctrine of liability for killings committed directly by persons other than the co-felons, in view of "the clear modern trend [of decisions] . . . away from the 'proximate cause' theory as a basis for felony-murder liability." They unaccountably fail to note that our holding in *People* v. *Washington, supra,* 62 Cal.2d 777, was precisely that the felony-murder rule extends only to killings perpetrated by felons, notwithstanding the fact that killings by others might be a foreseeable risk of committing the underlying felony, so that it might be regarded as a proximate cause of the killing. (62 Cal.2d at p. 781.) In *Washington,* we recognized that "[t]he felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability." (*Id.*, at p. 783.) We have recognized that the felony-murder doctrine "expresses a highly artificial concept that de-

---

[5]Washington was found guilty of first degree murder, Caldwell of second degree murder. These verdicts are not necessarily inconsistent. While substantial evidence would have supported a first degree murder verdict for Caldwell, too, the different verdicts may be merely an expression of mercy by the jury, which may have considered Caldwell to be the less culpable of the participants in the entire course of conduct.

serves no extension beyond its required application," in "impos[ing] malice as to one crime because of [a] defendant's commission of another . . . ." (*People* v. *Phillips* (1966) 64 Cal.2d 574, 582-583; see *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] [this court's most recent discussion and affirmation of the felony-murder rule].) Although defendants argue that the *Washington-Gilbert* line of decisions results in a similar cleavage between culpability and criminal liability, their contention does not bear scrutiny. It is simply inaccurate to say, as they do, that under the *Washington-Gilbert* rule of liability, "where a causal chain can be drawn between a defendant's course of conduct and the death, the homicide and malice are imputed to the defendant and the prosecution is relieved of its burden to establish proof of actus reus and mens rea for murder liability." Contrary to their claim, a common sense recognition of the idea that an act should be considered in the light of its natural and foreseeable results when they occur (see Perkins & Boyce, *supra,* at p. 806) does not *preclude* inquiry into the felons' subjective knowledge of the likely result of their actions; rather, it *informs* the inquiry. The proper focus on the individual culpability of accomplices is retained by the requirement that one or more of them engage in conduct which it is *highly probable* (not merely foreseeable) will result in death, evincing a *conscious disregard* of human life. (See Note, *Criminal Liability of a Participant in Crime for the Death of a Fellow Participant* (1970-1971) 22 Syracuse L.Rev. 1065, 1077.) Only where one or more of the co-felons has thus exhibited a culpable, murderous state of mind does a resulting death predicate liability for murder.

The fact that subtle distinctions sometimes have to be made in deciding whether conduct goes beyond commission of the underlying felony (see *In re Joe R.* (1980) 27 Cal.3d 496, 506, fn. 6, 508 [165 Cal.Rptr. 837, 612 P.2d 927]) does not require us to jettison the doctrine; certainly defendants' suggestion that their own conduct did not go beyond commission of a robbery requires no discriminating analysis.

### III

 Defendant Caldwell also complains that the standard instructions given by the trial court on aider and abettor liability—CALJIC Nos. 3.00[6]

---

[6]CALJIC No. 3.00 (1979 rev.) reads: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who, with knowledge of the unlawful purpose of the one who does directly and actively commit or attempt to commit the crime, aid and abet in its commission or attempted commission, or [¶] 3. Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission or attempted commission. [¶] [One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.]"

and 3.01[7]—were erroneous in failing to inform the jury that an aider and abettor must have a "criminal intent," in addition to having knowledge of the perpetrator's purpose and aiding, promoting, encouraging or instigating the commission of the crime.

These instructions do not accurately reflect the intent required of an aider and abettor. (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].) In this case, however, the error did not preclude the jury from considering and determining the question of Caldwell's intent. The defense was duress, upon which principle the jury was properly instructed in accordance with CALJIC No. 4.40.[8] The essence of his defense was that because he acted only because he had been threatened he did not have a criminal intent in driving Washington and Belvin away from the scene of the robbery and attempting to elude the pursuit; i.e., though he intended to facilitate the commission of the robbery, he did so only out of fear for his life. The jury evidently rejected this defense version of events in which Caldwell allegedly acted without criminal intent. Hence, the challenged instruction could not have affected the jury deliberation and verdict. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913].)

IV

Defendants each raise an additional issue requiring no extended discussion.

■ Caldwell complains that the trial court erred in sustaining a prosecution objection to an inquiry of Deputy Boothroyd on cross-examination whether he would have opened fire on the suspects' car "if [he] had not seen that handgun protruding . . . out of the vehicle and pointing towards [his] fellow officers." The question required the witness to speculate as to what his state of mind would have been in a hypothetical situation, and was properly objectionable.

---

[7]CALJIC No. 3.01 (1979 rev.) reads: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime. [Mere presence at the scene of a crime and failure to take steps to prevent a crime do not in themselves establish aiding and abetting.]"

[8]CALJIC No. 4.40 (1979) reads: "A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances:

"1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and

"2. If such person then believed that his life would be so endangered.

"This rule does not apply to threats, menaces, and fear of future danger to his life."

Washington contends that there is no substantial evidence that he possessed the requisite specific intent for robbery, characterizing defense evidence of diminished capacity (a sheriff's sergeant's testimony that three hours after he was captured defendant appeared lethargic and appeared to be drifting off to sleep, leading him to suspect him of being under the influence of a drug, perhaps PCP) as "uncontradicted." Mere consumption of drugs is insufficient to establish diminished capacity, however; the evidence must demonstrate the effect of such consumption on the defendant. (See *People* v. *Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]; *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900].) One of the employees of the robbed premises testified that Washington behaved in a calm, deliberate manner during the robbery. Moreover, the sheriff's sergeant on whose testimony Washington relies also testified that the latter understood his questions, answered coherently, followed instructions, and appeared rational. A defendant's actions may refute evidence of diminished capacity. (*People* v. *Spencer* (1963) 60 Cal.2d 64, 88-89 [31 Cal.Rptr. 782, 383 P.2d 134].)

The judgment is affirmed.

Mosk, J., Kaus, J., Broussard, J., and Grodin, J., concurred.

**KAUS, J.**—I concur in the judgment. I write separately to express a narrower view of what I consider the crucial evidence. Given the short span of time involved in this case—an interval that may have been as short as five seconds—I believe the jury could reasonably have found that Washington's conduct in pointing and discharging the shotgun was the "initiation of a gun-battle" which led to his co-felon's death. Under our cases, that malicious act is sufficient to sustain the murder convictions of both Washington and Caldwell. In light of this conclusion, there is no need to determine whether Caldwell's reckless driving was a proximate cause of the death or whether there is substantial evidence to support an implied finding that Caldwell possessed a handgun at the scene of the shooting. These factors may have added to the tension of the situation but they are not critical in the play of events.

In denying a motion for new trial, the trial court expressly relied on Washington's actions to support the jury's verdict, at the same time explaining why the jury may have found Washington in possession of a shotgun and yet acquitted him of assault on Officers Hunt and McSweeney: " . . . Now, the fact about that instant moment when Washington is alleged to have been hanging out the passenger window with the shotgun pointed in the direction of the windshield of the police car, there was some conflict, as I recall, whether or not in fact the shot was fired before the shotgun was

jarred out of his possession or whether it discharged as it was skidding on the street towards the curb. [¶] There was also some testimony from one of the deputies that it was pointed directly at the windshield. *Certainly it was that act with that gun pointing out the window that precipitated the entire gun battle,* at least based on the jury's findings. That must be what they concluded. But they were not satisfied beyond a reasonable doubt that he pulled the trigger as he was hanging out the window. . . ." (Italics added.)

Grodin, J., concurred.

**BIRD, C. J.**—I respectfully dissent.

Today's majority opinion holds that an accused may be convicted of murder for the killing of his accomplice by a police officer on the basis of (1) malicious acts that posed no threat at the time of the killing and (2) the "malicious" act of holding—but not pointing—a gun. In so ruling, the majority distort the prior decisions of this court and seriously undermine the well-established principle that the felony-murder rule does not apply to killings committed by persons other than the felons themselves. (See *People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].)

I.

As the majority assertedly recognize, neither appellant Caldwell nor appellant Washington could be convicted of murder under the felony-murder rule, since the victim was killed not by either of them, but by a deputy sheriff. (*People* v. *Washington, supra,* 62 Cal.2d at p. 783.) Nor could either appellant be convicted on the basis of the acts of Belvin, their deceased accomplice, because Belvin's malicious conduct "did not result in the unlawful killing of *another* human being, but rather in [his] own death." (*People* v. *Antick* (1975) 15 Cal.3d 79, 91 [123 Cal.Rptr. 475, 539 P.2d 43].)

It is agreed, then, that appellants could only be convicted of murder for their own actions under the rule of *People* v. *Gilbert* (1965) 63 Cal.2d 690, 704-705 [47 Cal.Rptr. 909, 408 P.2d 365], vacated on other grounds *sub nom., Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. To establish liability under *Gilbert,* the prosecution must prove that the accused or a surviving accomplice "intentionally commit[ted] an act that [was] likely to cause death, and [that] his victim or a police officer kill[ed] in reasonable response to such act . . . ." (*Id.,* at p. 704.)

This test contains two components corresponding to the two elements of the crime of murder, mens rea, or guilty state of mind, and actus reus, the

physical act of killing a human being. (*People* v. *Antick, supra,* 15 Cal.3d at pp. 86-87.)

Malice, the mens rea of murder, may be implied from the intentional commission of " ' "an act that involves a high degree of probability that it will result in death . . . ." ' " (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 704.) The "central inquiry" is whether "the conduct of a defendant or his accomplices was sufficiently provocative of lethal resistance to support a finding of implied malice." (*Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 583 [91 Cal.Rptr. 275, 477 P.2d 131], italics omitted, disapproved on another point, *People* v. *Antick, supra,* 15 Cal.3d at p. 92, fn. 12.)

A malicious act integral to the underlying felony is not enough for a finding of implied malice. The killing must be attributable "not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life." (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 704.) A threat "already inherent in the dangerous felony" is "insufficient for a finding of *Washington-Gilbert* murder even when it helped provoke the victim's lethal response." (*In re Joe R.* (1980) 27 Cal.3d 496, 508 [165 Cal.Rptr. 837, 612 P.2d 927].) It is this requirement of a malicious act over and above the underlying felony which most significantly differentiates liability under *Gilbert* from felony murder.[1]

The physical act of killing or "actus reus," though performed by a non-felon, may nevertheless be attributed to the accused provided his malicious act "proximately caused" the victim's death. (*Pizano* v. *Superior Court* (1978) 21 Cal.3d 128, 131 [145 Cal.Rptr. 524, 577 P.2d 659]; *Taylor* v. *Superior Court, supra,* 3 Cal.3d at p. 583.) To establish proximate cause, the prosecution must show that the malicious act of the accused or his surviving accomplice posed such a threat of harm as to provoke a reasonable lethal response. In such a case, the action of the third party "cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response *to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice.*" (*Gilbert, supra,* 63 Cal.2d at p. 705, italics added.)

Although a malicious act may be morally reprehensible in and of itself, it does not constitute *murder* unless the third party killed "in reasonable response *to such act* . . . ." (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 704, italics added; see also *In re Joe R., supra,* 27 Cal.3d at p. 506, fn. 6.)

---

[1]The felony-murder rule relieves the prosecution of proving the element of malice for a killing committed in the course of a felony by one of the perpetrators. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 473-476 [194 Cal.Rptr. 390, 668 P.2d 697].)

Conversely, the commission of an act which contributes causally to the accused's death, but is not itself malicious, cannot support a murder conviction.[2]

## II.

Today's majority opinion upholds appellants' murder convictions under the *Gilbert* rule. The majority point to three acts in support of the convictions: (1) appellant Caldwell drove the getaway car without headlights and at high speed through stop signs and red lights, (2) appellant Washington pointed a shotgun at two deputies prior to the crash, and (3) appellant Caldwell emerged from the car and crouched behind the open door, holding— but not pointing—a gun.

However, these acts could not have supported the findings of implied malice and proximate causation necessary to convict appellants of murder for the killing of their accomplice by the officers. Under the case law, the first two of these acts were indeed malicious, but could not conceivably have caused the victim's death. The third was neither malicious nor a proximate cause of the death.

It is true that Caldwell's driving and Washington's shotgun pointing were "sufficiently provocative of lethal resistance to support a finding of implied malice." (*Taylor* v. *Superior Court, supra,* 3 Cal.3d at p. 583, italics omitted.) However, no reasonable jury could find that either of those acts proximately caused Belvin's death.

At least five seconds before the deputies opened fire, the robbers' car was at rest, trapped between two police cars. Washington's shotgun was lying in the street out of reach. Both the car and the shotgun had "[come] to rest in a position of apparent safety." (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 780; maj. opn., *ante,* at p. 219.)

These facts make it abundantly clear that the deputies did not fire "in reasonable response" to the threats posed by Caldwell's reckless driving or by Washington's shotgun pointing. (*Gilbert, supra,* 63 Cal.2d at p. 704.) At the time of the shooting, neither act posed the kind of "dilemma" (*id.,*

---

[2]See *In re Joe R., supra,* 27 Cal.3d 496. There, the accused assisted his accomplice in moving the robbery victim from a relatively safe lighted area to a dark area, where the victim seized the accomplice's gun and killed him. This court held that the accused's act of assistance could not support a murder conviction because there was no indication that the purpose of moving the robbery victim was anything more than facilitating the safe completion of the robbery. (*Id.,* at p. 508.)

at p. 705) that could negate the conduct of the deputies as an independent intervening cause of Belvin's death.[3]

Furthermore, as to the shotgun, the jury expressly found that Washington did not personally use a firearm in the commission of robbery or murder. (Pen. Code, §§ 12022.5, 1203.06, subd. (a)(1).[4]) Thus, it is apparent that the jury did not find that Washington's brandishing of the shotgun proximately caused Belvin's death.[5]

Faced with the undeniable fact that any threat from the driving and shotgun pointing had completely dissipated by the time of the shooting, the majority acknowledge that the causal relationship does present a "difficult problem." (Maj. opn., *ante,* at p. 219.) The majority purport to solve this problem by relying on two highly questionable grounds to support the finding of proximate cause: (1) one deputy's testimony that the driving and shotgun pointing influenced his decision to fire, and (2) the jury's possible inference that in the absence of those two acts, Belvin may not have pointed his gun.

The first ground introduces into the law a creative and dangerous expansion of vicarious murder liability. No longer will it be required that a third party have fired in reasonable response to the accused's malicious act. Now, an accused may be convicted of murder for such an act even when the third party fires in reasonable response to the threat posed by some *other* danger. According to the majority, an accused may face potential murder liability

---

[3]It is noteworthy that this case does not present the situation where a person sets off a chain of provoked responses. In that case, a person might be convicted of murder even though his gun lay in the street at the moment of the actual killing. In the present case, however, the lull between appellants' malicious acts and the gun battle was sufficient to break any chain that might have commenced. Moreover, Deputy Boothroyd—the only deputy to testify that the driving or shotgun pointing figured in his decision to fire—stated that the lull lasted at least 12 seconds, and that the shotgun was "no longer a problem" at the time of the shooting.

[4]Hereafter, all statutory references are to the Penal Code.

[5]The majority attempt to explain away this problem by suggesting that the jury "may have decided that Washington was prevented from 'using' the shotgun when the patrol car rammed the suspects' vehicle and it flew out of his hands." (Maj. opn., *ante,* at p. 220, fn. 3.) Having thus made Washington's argument for him, the majority proceed to misconstrue the term "use" in a manner totally unfounded in law or logic: "It is true that a criminal can 'use' a gun merely by displaying it, but that was evidently not what Washington had in mind; merely displaying it would have served no purpose—i.e., would have been 'use'-less—in the circumstances." (*Ibid.*) Where this construction of personal use came from or what relevance it has to the proximate cause issue is left unexplained. In any case, the jury was clearly instructed that the term "used a firearm" means "*to display a firearm in a menacing manner,* intentionally to fire it, or intentionally to strike or hit a human being with it." (Italics added.)

for his malicious act as long as the impact of that act lingers on in the fears of the third party.[6]

The error of the majority's new rule is highlighted by the facts of this case. Only Deputy Boothroyd mentioned the driving or shotgun pointing as factors in his decision to fire. He testified that he fired because of his "whole frame of mind due to the circumstances leading up that point." Those circumstances included: "the pursuit [and] the evasiveness of the driver during the pursuit[.] [O]ne gun [Washington's] had been seen and was no longer a problem at that time but, then, another handgun [Belvin's] comes out. There are still three people in the vehicle, and the possibility of having more guns in the car at that time went through my mind and the fact that the other two persons in the vehicle [appellants] were out of sight at that time." Boothroyd further testified that some 12 to 13 seconds after the shotgun had dropped to the street a shot—the first he had heard—triggered his firing.

On this testimony, a jury could certainly have found that Deputy Boothroyd's decision to fire was reasonable. However, such a finding does not mean that appellants were guilty of murder. Deputy Boothroyd considered many factors that were extraneous to appellants' guilt, such as Belvin's pistol pointing and the fact that both appellants were out of his sight. No reasonable jury could have found that appellants' acts confronted Boothroyd with the life-threatening "dilemma" (*Gilbert, supra,* 63 Cal.2d at p. 705) that eliminated his firing as an independent intervening cause. Rather, the record points inescapably to the conclusion that Belvin's own pistol pointing posed the only immediate threat visible to Boothroyd.

According to the majority's second theory of causation, the jury might have found that Belvin would not have been willing to provoke a gun battle had appellants not continued to resist. According to this view, the "inferential importance" of the shotgun waving to Belvin militates in favor of a finding of proximate cause.

This theory neatly overrules *People* v. *Antick, supra,* 15 Cal.3d 79, on the issue of causation. *Antick* held that an accused cannot be held liable for the provocative acts of an accomplice who himself becomes the victim of the police response. (*Id.,* at p. 91.) However, under today's majority opinion, an accused may be held responsible for the provocative acts of his deceased accomplice on the assumption that the deceased might have ceased his provocative conduct had the accused surrendered. (Maj. opn., *ante,* at p. 220.)

---

[6]The majority find a significant causal connection in the fact that one deputy counted Washington's shotgun pointing "among his reasons for fearing for his and his compatriots' safety." (Maj. opn., *ante,* at pp. 219-220.)

This exception swallows the *Antick* rule. It is difficult to imagine a situation in which the actions of co-felons are not sufficiently interconnected to support a jury finding that one might not have acted but for the continued resistance of others.

In support of its relaxed approach to causation, the majority cite a number of cases involving multiple causation. (Maj. opn., *ante,* at pp. 220-222.) These cases, however, support appellants' position. In each case, a third party killed in reasonable response to the immediate threat posed by a malicious act of the accused or his surviving accomplice. For example, the appellant in *In re Tyrone B.* (1976) 58 Cal.App.3d 884 [130 Cal.Rptr. 245], shoved and stabbed the robbery victim while the accomplice beat him with a shovel handle. In response, the robbery victim shot the accomplice. (*Id.,* at pp. 886-887.) In *People* v. *Velasquez* (1975) 53 Cal.App.3d 547 [126 Cal.Rptr. 11], the accused and his brother both repeatedly struck an officer with batons and persisted in their attack despite a second officer's warnings to stop. The second officer then shot and killed the accused's brother. (*Id.,* at pp. 551-552.) Finally, in *People* v. *Claflin* (1978) 87 Cal.App.3d 1, one of the appellants charged a police officer, struck him, and grabbed the barrel of his gun. (*Id.,* at pp. 3-4.)

In marked contrast to the malicious acts in those cases, neither the driving nor the shotgun pointing in the present case posed an immediate threat at the time of the killing.

In addition to the driving and shotgun pointing, the majority rely on Caldwell's post-crash conduct to support these convictions. They assert that appellants may be convicted of murder for Caldwell's "malicious" act of taking cover and assertedly holding, but not pointing, a gun. This theory fails for two reasons.

First, the record does not support a finding that Caldwell was holding a gun when he stepped out of the car. There were eight officers on the scene, *but only one,* Deputy McSweeney, testified to having caught a brief glimpse of something "recognizable" as a gun when Caldwell left the car.[7] The alleged gun was never found. A search of the area and of the robbers' car turned up only Washington's shotgun and Belvin's handgun.

To survive appeal, a criminal conviction must be supported by "substantial evidence." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 562 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The reviewing court

---

[7]Also, in his written report of the shootout, Deputy McSweeney stated that Caldwell exited the car holding what "appeared to be a gun."

must assess the record "in the light most favorable to the judgment below." (*Id.*, at p. 578.) However, "[t]he court does not . . . limit its review to the evidence favorable to the respondent." (*Id.*, at p. 577.) Instead, "our task in this regard is twofold. First, we must resolve the issue in the light of the *whole record* . . . and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements constituting the higher degree of the crime is *substantial*; it is not enough for the respondent simply to point to 'some' evidence supporting the finding, for 'Not every surface conflict of evidence remains substantial in the light of other facts.' " (*People* v. *Bassett* (1968) 69 Cal.2d 122, 137-138 [70 Cal.Rptr. 193, 443 P.2d 777], fn. omitted; see *People* v. *Johnson, supra*, 26 Cal.3d at p. 577.)

To conclude that Caldwell had a gun, a jury would have had to find beyond a reasonable doubt: (1) that the object glimpsed by Deputy Mc-Sweeney but by no other officer was a gun, (2) that Caldwell managed to throw it away without being observed, and (3) that he hurled it far enough to evade the officers' subsequent search. But the robbers' car was under continuous observation from the moment Caldwell left it to the moment of surrender seconds later. Eight officers and four squad cars were grouped within a few yards of the robbers' car. No officer testified to having seen Caldwell dispose of the gun or make any rapid movement. The entire area around the scene of the shootout was searched by police officers, as was appellants' car. No trace of the alleged weapon was found. This is not *substantial* evidence—i.e., "evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined" (*People* v. *Conner* (1983) 34 Cal.3d 141, 149 [193 Cal.Rptr. 148, 666 P.2d 5])—that Caldwell possessed a gun as he emerged from the car.

Second, even accepting arguendo the majority's conclusions as to the "substantial" nature of the evidence, Caldwell's conduct after the crash cannot—as a matter of law—support these murder convictions. In *sum toto*, Caldwell left the car, crouched behind the open door, and looked at a deputy—all while carrying a handgun. He did not point the gun, issue a threat, move toward the deputies, or make any other affirmative gesture of an intent to inflict harm. At most, this conduct indicates that he had not yet decided to surrender.[8] It adds nothing of significance to the original felony of armed robbery. Moreover, the jury found that Caldwell's conduct did not even amount to assault.[9]

---

[8] By all accounts, appellant maintained this indecisive posture for less than a minute.

[9] The jury found Caldwell not guilty of assault with a deadly weapon on a peace officer (§ 245, subd. (b)).

Until today, California courts have uniformly required evidence of some affirmatively aggressive action by the accused or his surviving accomplice to support a finding of implied malice under *Gilbert.* In *Gilbert,* a surviving felon shot a policeman, initiating a gun battle.[10] Similarly, in *Pizano* v. *Superior Court, supra,* 21 Cal.3d 128, a robber pointed a pistol at the robbery victim, threatened to shoot him if the police intervened, and used him as a shield. (*Id.,* at pp. 132-133.) In *Taylor* v. *Superior Court, supra,* 3 Cal.3d 578, one of the robbers threatened a storeowner with death and " 'chattered insanely.' " (*Id.,* at p. 581.)[11] And in *People* v. *Reed* (1969) 270 Cal.App.2d 37 [75 Cal.Rptr. 430], the accused pointed his gun toward one of the officers and toward the victim. (*Id.,* at p. 42.)[12]

Nevertheless, a majority of this court assert that Caldwell's departure from the car amounted to a malicious act. They reason that the jury could have found this act to have provoked a reasonable, lethal response. This reasoning ignores the requirement that, regardless of the reasonableness of the police response, the accused's conduct must be "sufficiently provocative of lethal resistance *to support a finding of implied malice."* (*Taylor* v. *Superior Court, supra,* 3 Cal.3d at p. 583, italics added.)

The majority confuse the reasonableness of the deputies' response, which goes to the proximate cause issue,[13] with the question of implied malice, which goes to appellant's state of mind. In so doing, they bypass Caldwell's state of mind, or mens rea, which is one of the basic elements of murder. In effect, this omission reestablishes the felony-murder rule for killings by third parties and directly contravenes this court's holding in *People* v. *Washington, supra,* 62 Cal.2d at page 783.

---

[10]The officer in *Gilbert* shot and killed Weaver, an accomplice, after appellant Gilbert shot another officer. The court reversed the surviving felons' convictions because the jury had not been instructed that appellants could only be convicted if the officer shot Weaver in response to Gilbert's firing. (63 Cal.2d at pp. 696-698, 703-704.)

[11]In addition, another robber, who became the victim, pointed a gun at the store owner. To the extent that the *Taylor* opinion relied on this factor, it was disapproved in *People* v. *Antick, supra,* 15 Cal.3d at page 92, footnote 12.

[12]See also *People* v. *Claflin, supra,* 87 Cal.App.3d at pages 3-4 (one of the appellants charged a police officer, struck him, and grabbed the barrel of his gun); *In re Tyrone B., supra,* 58 Cal.App.3d at pages 886-887 (appellant shoved and stabbed the robbery victim); *People* v. *Velasquez, supra,* 53 Cal.App.3d at pages 551-552 (appellant repeatedly struck an officer with a billy club).

[13]If the deputies had opened fire unreasonably, their firing would have constituted an intervening cause sufficient to relieve appellants of liability for the killing. "[T]he victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, *for it is a reasonable response* to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice." (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 705, italics added.)

The reasonableness of the police response had no bearing on Caldwell's state of mind. It is one thing to say that a police response was reasonable. It is quite another to say that the defendant should be held liable for murder. As noted above, in deciding whether to fire, an officer must consider many factors that are extraneous to the accused's culpability. Here, for example, a deputy apparently concluded that Caldwell's failure to surrender or to drop his alleged gun, *combined with* Belvin's threatening gestures, required preemptive action. Even remaining in the car could have been interpreted by the police as indicating an intent to resist.[14] Such conclusions could arguably be considered reasonable, but they cannot substitute for a finding of intentional conduct by Caldwell which affirmatively establishes a malicious intent on his part.

To equate the reasonableness of the police response with the element of the accused's implied malice is to subvert the requirement that a jury convict an accused only if all the elements of murder are proven beyond a reasonable doubt. Instead of finding beyond a reasonable doubt that the accused or his surviving accomplice actually committed malicious acts, a jury now need only determine that a deputy reasonably believed that lethal force was appropriate to prevent possible harm or escape. Hence, an accused's culpability for murder would hinge not on his own actions or state of mind, but on an officer's subjective impression of the situation, including factors extraneous to the actions of the defendants.

Not only was Caldwell's post-crash conduct insufficiently provocative to support a finding of implied malice, but it also could not conceivably have caused Belvin's death. Deputy McSweeney, the only officer who testified to having seen Caldwell with a gun, fired not at Belvin (the decedent), but at Caldwell.

Evidently sensing the weakness of this causal connection, the majority attempt to bolster their position by suggesting that the robbers might have acted "in concert" to provoke the shooting. According to this theory, the jury might "reasonably have inferred that Belvin would have been unwilling to provoke a gun battle if Caldwell had not similarly adopted an aggressive stance, refusing to drop his gun." (Maj. opn., *ante,* at p. 220.) However, as explained above, the majority's attempt to run the causal link through the deceased accomplice's subjective state of mind effectively overrules the sound holding of *People* v. *Antick, supra,* 15 Cal.3d 79. (See *ante,* at pp. 217-219.)

---

[14]This is borne out by the deputies' reaction to Washington, who remained inside the car and appeared to be groping around for something while looking at the deputies. The deputies, perhaps reasonably, considered this conduct to be threatening. But it can scarcely be considered a "malicious" act sufficient to support a murder conviction.

## III.

In *People* v. *Washington, supra,* 62 Cal.2d at page 783, this court held that the felony-murder rule does not apply to killings not physically committed by the felons themselves. Today's majority opinion takes a big step toward overturning that sound holding.

What differentiates *Gilbert* murder from traditional felony murder is the requirement of a malicious act by one of the surviving accomplices. (See LaVaute, *Criminal Liability of a Participant in Crime for the Death of a Fellow Participant* (1971) 22 Syracuse L.Rev. 1065, 1074-1077.) However, under the majority's approach, malice may be so easily implied that the distinction is now more apparent than real. Malice may be implied from acts that no longer posed a threat at the time of the killing. It may be implied from the mere holding—but not pointing—of a gun. It may be implied from acts that did not themselves provoke a lethal response, but that influenced the deceased felon to provoke his own death.

I respectfully dissent from this unsupported expansion of vicarious murder liability.

Appellant's petitions for a rehearing were denied August 31, 1984. Bird, C. J., was of the opinion that the petitions should be granted.