Filed 5/30/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>     Petitioner,<br><br>     v.<br><br>THE SUPERIOR COURT OF<br>RIVERSIDE COUNTY,<br><br>     Respondent;<br><br><br>DIANA CONTRERAS CHAGOLLA,<br><br>     Real Party in Interest. | D082865<br><br>(Riverside<br>Super. Ct. No. INF2100736) |

ORIGINAL PROCEEDING on a petition for writ of mandate. Relief denied.

Michael A. Hestrin, District Attorney, and Sophia Choi, Deputy District Attorney, for Petitioner.

James M. Crawford, under appointment by the Court of Appeal, for Real Party in Interest.

No appearance for Respondent.

While under the influence of prescription painkillers, Diana Contreras Chagolla led California Highway Patrol (CHP) officers on a 35-mile, high-speed chase, traveling eastbound on the Interstate 10 highway (I-10). The chase ended when Chagolla lost control of her vehicle, which crashed into the guardrail and came to rest, blocking the middle two lanes of traffic. For about 30 minutes, CHP officers ordered Chagolla out of her car, but she did not comply. Ultimately, a CHP officer shot out one of the vehicle's windows, and 10 minutes later, another officer extracted Chagolla from her car. About 45 minutes had elapsed since she crashed her vehicle. Chagolla appeared to be in and out of consciousness and mumbling incoherently. In custody, Chagolla seemed to be under the influence of some substance and was not very responsive. A subsequently performed blood test confirmed that Chagolla had ingested a large dose of oxycodone.

About 30 minutes after Chagolla's vehicle came to rest in the middle of the I-10, a four-vehicle collision occurred about half a mile to a mile away from Chagolla's vehicle. A tractor-trailer traveling five to 10 miles above the speed limit and whose driver was distracted looking for his sunglasses, hit another tractor-trailer, went out of control, hit a passenger vehicle, and then struck a second tractor-trailer and burst into flames, killing the driver of the last struck vehicle.

Among other crimes, Chagolla was charged with murder (Pen. Code,[1] § 187, subd. (a); count 1) and unlawfully causing death to a person while driving a motor vehicle in attempting to elude a peace officer (Veh. Code, § 2800.3, subd. (b); count 2). Counts 1 and 2 were based on the theory that Chagolla's actions caused the four car accident and the death of the driver of the second tractor-trailer.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

Chagolla's trial counsel subsequently moved under section 995 to set aside the information. The court granted the motion as to counts 1 and 2.

The People then filed this petition for mandate, arguing that the superior court erred in setting aside counts 1 and 2. They ask us to direct the court to vacate its order and reinstate counts 1 and 2. We decline to order the requested relief.

FACTUAL AND PROCEDURAL BACKGROUND

The People charged Chagolla by felony complaint filed May 10, 2021 with the following offenses: murder (§ 187, subd. (a); count 1); evading law enforcement causing injury or death (Veh. Code, § 2800.3; count 2); fleeing a police vehicle (Veh. Code, § 2800.2; count 3); willfully resisting a police officer (§ 148, subd. (a)(1); count 4); and driving under the influence of a drug and causing bodily injury (Veh. Code, § 23153, subd. (f); count 5). The matter proceeded to a preliminary hearing on June 30 and July 1, 2022. A total of eight witnesses testified and the facts are essentially undisputed.

*Preliminary Hearing*

On May 17, 2018, at about 5:42 a.m., CHP Officer Guadalupe Villalobos and his partner Officer Steven Rivas were conducting traffic control on the I-10 for eastbound traffic. Construction work was ongoing on the freeway and only one lane of travel, the far right lane, was open. The other two lanes were closed to traffic with traffic cones and there was signage indicating " 'Left two lanes closed ahead.' "

Officer Villalobos saw a silver car approaching the construction zone from his rearview mirror, traveling at a high rate of speed in the number 1 lane. He estimated the speed of the car to be faster than 100 miles an hour. Officer Villalobos proceeded to pursue this car with his emergency lights and siren activated. During the pursuit, Officer Villalobos reached speeds of

3

about 100 miles per hour.  In all, he traveled about 40 miles in around 20 minutes while pursuing Chagolla.  Two other CHP officers joined in the pursuit with the lights and sirens activated on their vehicles.  During the pursuit, Officer Villalobos witnessed Chagolla violate multiple Vehicle Code sections, and he determined that she was driving in a dangerous and reckless manner.

The pursuit ended at 6:06 a.m., when Chagolla attempted to pass a truck and struck a guardrail with her car.  The car spun out of control and hit the center median.  After the car came to a rest, it was blocking the number 1 and 2 lanes of the I-10.

Officer Villalobos's patrol car also collided with the guard rail.  He suffered minor injuries as did his partner Officer Rivas.

After the collision, Officer Villalobos exited his patrol car and initiated a felony stop on Chagolla's vehicle.  To this end, CHP officers ordered Chagolla to exit her car numerous times for about 30 minutes but received no response.  Officer Villalobos did not notice any movement coming from within Chagolla's car.  That said, all the air bags in Chagolla's vehicle had deployed, so it was difficult to see inside the car.  However, Officer Michael Fox, who was providing air support during the ordeal indicated that he observed "slight movement" and "minimal movement inside the vehicle."  Officer Fox witnessed these movements about four minutes after Chagolla's vehicle crashed into the center divider.  No one else at the preliminary hearing testified as to seeing any movement in Chagolla's vehicle.

Officer Rivas made numerous announcements directing Chagolla to get out of her car, saying:  " 'Come out with your hands out.  Get out of the vehicle.  Let's get the vehicle out of the roadway.  Let's let traffic continue on through.  Step out of the vehicle.' "  Officer Rivas acknowledged that there

4

was no indication Chagolla was able to comprehend what he was saying. Indeed, he confirmed that Chagolla did not seem to respond at all to his verbal commands.

As a result of Chagolla's collision, the CHP had the I-10 shut down on the eastbound side. The CHP has a procedure for dealing with traffic when it backs up where officers will conduct a traffic break to slow traffic down. Although some of the officers on the scene were concerned about traffic backing up, no one suggested doing a traffic break. However, Officer Rivas testified that he did not believe a traffic break would be effective. To this end, he explained:

> "Because once—once I actually—the vehicle came to a stop and crashed and I was able to exit the vehicle, the first thing I did was see if anybody was coming up behind us, and traffic had already come to a stop.

> "So because of the time delay, everybody that was coming was stopped systematically on their own."[2]

CHP Officer James Moran, a certified drug recognition expert, responded to the scene after the collision. Upon his arrival, officers were attempting to get Chagolla to exit her car, and her car was blocking the freeway. Eventually, Office Moran shot out the window of the car, using a less-lethal shot gun. Chagolla did not appear to respond whatsoever to her vehicle's window being shot out. After shooting the window out, the officers retreated. Despite CHP officers continuing to say commands in both English

---

[2] The testimony about running a traffic break is somewhat muddled in the record. Although there was testimony that no one on the scene suggested running a traffic break, one officer testified that he was traveling eastbound on the I-10 when he heard an announcement over the radio about Chagolla's crash, so he started "breaking and slowing traffic that was at freeway speed behind [him], but when he got to within a half mile [of Chagolla's accident], everything was stopped already."

5

and Spanish to Chagolla, instructing her to exit the vehicle, she still did not respond.

About five to 10 minutes after shooting the vehicle's window out, an officer started driving a patrol vehicle forward with the doors open toward Chagolla's vehicle. The patrol vehicle "drove right up to the left side of the car that was blocking the roadway." Officer Moran then approached Chagolla's vehicle and pulled the air bag back from the broken window using the barrel of the less-lethal shotgun. In doing so, he could see Chagolla. "She mumbled a little bit, but she wasn't being coherent with anything she was saying." When Officer Moran, approached Chagolla, he saw that her eyes were open. However, they did not remain so: "When we made the contact, she was—she was closing her eyes, opening her eyes, closing her eyes, opening her eyes. Her eyes were rolling back."

About 45 minutes after Chagolla's car came to a stop, Chagolla was removed from her car.[3] Officer Moran described his impression of Chagolla:

> "She had very constricted pupils at the time. They were about 1.5 millimeters, which was really constricted for daytime. And she had white coating around her mouth and her lips, which I recognize as somebody that's usually using some type of pain medication. I've seen it multiple times on people that have used pain meds. Raspy, mumbly voice, very lethargic, kind of out of it on and off, in and out of consciousness."

Officer Moran further remarked that Chagolla "[j]ust appeared to be like not all there with what was going on."

---

[3] Officer Villalobos estimated that Chagolla's car sat blocking the number 1 and 2 lanes for approximately 30 to 40 minutes before she was extracted from the car.

Chagolla was handcuffed and escorted to a patrol car by CHP Officer Eric Pena. She was able to walk with Officer Pena's assistance. Chagolla did not have any weapons. Officer Pena observed some signs of intoxication and impairment but could not associate her symptoms with a high level of intoxication.

A blood test of Chagolla's blood revealed 902 nanograms per milliliter of oxycodone present. The therapeutic ranges are between 5 milligrams and 50 milligrams. According to the toxicologist whom Officer Moran consulted, severe health problems would occur if a person had 600 nanograms in their system. The toxicologist indicated no one should drive a motor vehicle with that level of oxycodone in their system. In addition, Officer Moran concluded, based on the nanogram level and Chagolla's driving pattern, that she could not drive with the care and caution of a sober person.

Isaac White, supervising investigator for the Riverside County District Attorney's Office, interviewed emergency room physician Dr. Mark Johnson who treated Chagolla at a hospital after the accident. Dr. Johnson's notes indicated Chagolla was cooperative and nonsuicidal. The doctor told the investigator that he had reviewed his records and he made no notations that Chagolla was experiencing psychiatric symptoms. Dr. Johnson noted that Chagolla was oriented as to person, time, place, and situation.

CHP Officer Mark Larson responded to a call regarding a four vehicle collision that occurred at 6:36 a.m. on the I-10. The investigation revealed that Vehicles 2 and 4 had come to a complete stop because of the backup due to Chagolla's vehicle blocking two lanes of the I-10. Vehicle 1, a tractor-trailer driven by Jeremy S., was driving eastbound in the number 2 lane of the I-10 and struck the rear of Vehicle 2, also a tractor trailer. Vehicle 1 went out of control and struck the rear of Vehicle 3, a compact passenger

7

vehicle. That collision caused Vehicle 3 to go out of control and strike a guard rail on the far left side of the freeway. Vehicle 1 continued forward and then struck Vehicle 4, another tractor-trailer.

Officer Larson interviewed the driver of Vehicle 1, Jeremy, and his father, Marcelino S. Before the collision, Marcelino was sleeping in the truck. He heard Jeremy yell, "Shit," and the collision occurred moments later.

Officer Larson also interviewed Bruce W. Bruce indicated he was traveling eastbound on the I-10 when he noticed traffic ahead was coming to a stop. He slowed down and activated his emergency hazard lights. Bruce observed a tractor-trailer (driven by Jeremy) rapidly approaching the rear of his tractor-trailer. Jeremy's big rig was approaching Bruce's big rig at a speed of 60 to 65 miles per hour, and Bruce concluded it was not going to stop before colliding into his vehicle. Thus, he braced himself for impact. The tractor-trailer collided into Bruce's truck, jackknifed, and then caught on fire becoming fully engulfed in flames.

Vehicle 4, driven by victim Pierre F., also was a tractor-trailer and caught on fire when Jeremey's tractor-trailer collided with it. Officer Larson approached Pierre, who was lying on the side of the road on his back and appeared to be unconscious and could not speak. He had been severely burned over his entire body as a result of the collision.[4]

Officer Larson determined the cause of the collision was Jeremy driving at an unsafe speed for the current traffic conditions and being inattentive to his driving. Jeremy was driving between 60 and 65 miles an hour, and the maximum speed limit at that location was 55 miles per hour. In addition,

---

[4]     For purposes of the preliminary hearing only, the parties stipulated that Pierre died May 17, 2018, and his cause of death was "thermal cutaneous injuries."

Jeremy admitted to not paying attention because he was looking for his sunglasses because the sun was in his eyes. At the time he was driving the tractor-trailer, Jeremy's Class A commercial license had expired. Jeremy's tractor-trailer hit two vehicles and then Pierre's tractor-trailer. At some point while colliding with the first two vehicles, the gas tank on Jeremy's tractor-trailer became perforated and ultimately exploded. The gas from Jeremy's big rig caused Pierre's big rig to catch fire. Officer Larson concluded that Jeremy was negligent and his negligence was the cause of the accident.

CHP Officer Jeffrey Dyer responded to the scene of a collision involving several tractor-trailers and an explosion. He interviewed Jeremy at the scene before Jeremy was transported to a hospital. Jeremy indicated he was driving his truck in the number 2 lane eastbound on the I-10 at about 60 mph when the sun got into his eyes. He reached down to grab his sunglasses and did not see the traffic coming to a stop in front of him.

The incident on May 17, 2018, was not Chagolla's first encounter with law enforcement. On June 18, 2016, Colton Police Officer Guillermo Bermudez responded to a reckless driver call. A caller had reported that a car was running stop signs, driving on the wrong side of the road, and driving recklessly. Officer Bermudez responded to the scene and saw the car drive southbound through an intersection without stopping at the stop sign. The driver, Chagolla, then proceeded the wrong way onto F Street, a one-way street.

Officer Bermudez conducted a traffic stop and talked to Chagolla. He advised Chagolla that she was driving very dangerously, which could seriously injure or even kill someone. Chagolla was very upset and was not paying very much attention to what Officer Bermudez was saying. She was placed under arrest for reckless driving and her car was towed.

9

At the conclusion of the preliminary hearing, the magistrate ultimately found that the People offered sufficient evidence to support all the charged offenses except for count 2. However, before reaching its findings, the magistrate explained the complexity of the instant matter:

> "This is the most difficult case I've had in quite some time. Part of it is based upon the fact that it appears that this is a somewhat unique factual pattern, and it does constitute an extremely tragic event that makes the decision carry a great deal of weight with respect to the position of all parties in this matter.

> "I did attempt to conduct some research with respect to finding a case that was similar in the factual pattern to the instant case, and I was not able to come up with any. So it does seem to me that, although perhaps not unique in the law, it is certainly unique with respect to the facts, and that makes it more difficult to arrive at a decision.

> "I don't mind saying that I expect my decision to be tested on a [section] 995 [motion], and I do hope that whoever loses on the [section] 995 [motion] take it up to the Court of Appeals to—to test it with respect to the findings that I make.

> "With respect to the felony Complaint, I do find—and I'm convinced by the argument of the People—that the violation of Penal Code Section 187 did occur as alleged under Count 1, and the defendant is likely the perpetrator thereof. Specifically, I do find that there is sufficient evidence with respect to the defendant entertaining conscious[ ] [dis]regard for the safety of the human being, and that the conduct which is—has been presented here does satisfy the [*People v.*] *Watson* [(1981) 30 Cal.3d 290 (*Watson*)] test. So I'm going to issue a holding order with respect to Count 1.

> "With respect to Count 2, I agree with the defense that the plain language of the statute does require that the offense occurred in the operation of a motor vehicle, and it does not appear to me that the vehicle is being operated at the time

10

of the actual occurrence causing the death to another person.  So I'm going to discharge defendant as to Count 2."

*Post-Preliminary Hearing*

On July 15, 2022, the People filed an information that included all of the previous charges (including count 2).

Chagolla then filed a motion to set aside the information under section 995, specifically challenging counts 1 and 2.  There, she argued that her actions were not the proximate cause of the victim's death.  As such, counts 1 and 2 could not stand.  Chagolla also maintained there was insufficient evidence of implied malice and that she could not have violated Vehicle Code section 2800.3 because she was not driving or trying to elude a peace officer at the time of the victim's death.

The People opposed Chagolla's motion, arguing sufficient evidence was presented at the preliminary hearing for the trial court to determine Chagolla's actions were the proximate cause of the victim's death, there existed sufficient evidence of implied malice, and Vehicle Code section 2800.3 did not require that Chagolla be driving or actively evading law enforcement at the time of the victim's death.

In granting the motion, the trial court explained that it believed Chagolla engaged in a volitional act before she crashed her vehicle, however:

> "Where the Court struggles, and ultimately the Court is going to decide, is that there simply is no evidence that after the crash she chose volitionally to stay in the car. On that basis, I am going to grant the motion as to Count 1 and dismiss that count.

> "As to Count 2, I will echo Judge Prevost's concern that the driving here does not occur at the time of the death.  And I believe under both the section and the CALCRIM, that element is missing.  For that reason, I will grant the motion as to Count 2."

11

The People subsequently filed the instant petition for writ of mandate in Division Two of the Fourth Appellate District. That division invited real party in interest to file an informal response to the petition. Additionally, the court stayed the criminal proceedings against Chagolla. Chagolla filed an informal response, and the matter was transferred to this court. We issued an order to show cause and, absent any objection, we deemed Chagolla's informal response as her return to the order to show cause. Chagolla did not object. The People filed a reply.

## DISCUSSION

The law regarding consideration and review of a motion pursuant to section 995 is clear. The magistrate's role at the preliminary hearing is "to determine whether there is 'sufficient cause' to believe defendant guilty of the charged offense." (*People v. Abelino* (2021) 62 Cal.App.5th 563, 573 (*Abelino*); see § 872.) " 'Sufficient cause' " in this context means " 'reasonable and probable cause,' "—in other words, facts that would lead a person "of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667.) An information will not be set aside if there is "some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.)

Evidence sufficient to justify a prosecution need not be sufficient to support a conviction. (*People v. Scully* (2021) 11 Cal.5th 542, 582.) Probable cause "signifies a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1189.) Indeed, it is well settled that, when it comes to the

12

required showing for probable cause, the bar is " 'exceedingly low.' " (*Abelino, supra,* 62 Cal.App.5th at p. 573.)

Under section 995, the court must set aside the information if the defendant has been committed without reasonable or probable cause. (§ 995, subd. (a)(2)(B).) "When we review a section 995 motion, we 'disregard[ ] the ruling of the superior court and directly review[ ] the determination of the magistrate.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654.) If the magistrate has made factual findings, those findings are conclusive if supported by substantial evidence. (*People v. Slaughter* (1984) 35 Cal.3d 629, 638.) But the magistrate's determination regarding the existence of probable cause "is reviewed as an issue of law." (*Id.* at p. 639.)

Here, the People contend, and Chagolla does not dispute, that the magistrate did not resolve any factual disputes or assess the credibility of the witnesses when considering the sufficiency of the evidence, and as such, we should apply a de novo review. (See *People v. Barba* (2012) 211 Cal.App.4th 214, 222.) We agree that the magistrate essentially accepted the evidence presented by the prosecution at the preliminary hearing in concluding the evidence supported a murder charge. Thus, we find that the magistrate's determination that the evidence was sufficient as to count 1 was a legal conclusion. (See *People v. Slaughter, supra,* 35 Cal.3d at p. 638; *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 546 [where "the prosecution witnesses' testimony 'was not inherently improbable, [they were] not significantly impeached, and the [magistrate] made no findings as to [their] demeanor,' [the court] must conclude that the magistrate's remarks are legal conclusions"].) In addition, the magistrate's determination that count 2 could not stand was based solely on the interpretation of a statute, which presents a question of law as well. (See *People v. Salcido* (2008) 166 Cal.App.4th

13

1303, 1311.)  Accordingly, we review the record independently to determine whether the evidence presented at the preliminary hearing constituted sufficient cause to sustain count 1.  (*Zemek*, at p. 546; *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 499.)  Moreover, if necessary, we independently interpret the Vehicle Code section 2800.3 to determine whether the magistrate correctly found count 2 could not be charged.

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  Murder committed without premeditation and deliberation is of the second degree.  (§ 189; *People v. Elmore* (2014) 59 Cal.4th 121, 133.)  Malice may be express or implied for second degree murder.  (§ 188, subd. (a); *People v. Wolfe* (2018) 20 Cal.App.5th 673, 681 (*Wolfe*).)  "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger."  (*Elmore*, at p. 133.)  Thus, killing a person while driving intoxicated is second degree murder if "a person, knowing that his [or her] conduct endangers the life of another, nonetheless acts deliberately with conscious disregard of life."  (*Watson*, *supra*, 30 Cal.3d at p. 296.)

Below, the magistrate determined that the evidence presented at the preliminary hearing was sufficient to satisfy the *Watson* test.  In *Watson*, the defendant drove to a bar and consumed large quantities of beer.  After leaving the bar, he drove through a red light and narrowly avoided a collision with another car.  He then drove away at a high speed, accelerating to 84 miles per hour before suddenly braking and skidding into an intersection where he collided with another car, killing two people.  The defendant's blood-alcohol level one-half hour after the collision was 0.23 percent.  An information charged him with two counts of second degree murder,

14

but the trial court dismissed the murder counts. (*Watson*, *supra*, 30 Cal.3d at pp. 293–294.)

On the People's appeal, our high court reversed the dismissal, holding there was sufficient evidence to uphold the second degree murder counts in the information. (*Watson*, *supra*, 30 Cal.3d at p. 301.) The court cited to the following evidence as sufficient to support a finding that the defendant acted with conscious disregard for life (implied malice): the defendant's blood-alcohol level was sufficient to find him legally intoxicated; he drove to the establishment where he was drinking knowing that he had to drive later; he presumably was aware of the hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and he was aware of the risk, as shown by the near collision and his belated attempt to brake before the fatal collision. (*Id.* at pp. 300–301.)

After *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. (See, e.g., *Wolfe*, *supra*, 20 Cal.App.5th at p. 683 [driver had blood-alcohol level of 0.34 percent, was aware of dangers of drinking and driving and had previously used a taxi service, drank with intention of driving home, and continued driving her damaged vehicle after hitting a pedestrian]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358–359 (*Autry*) [driver had a blood-alcohol level of 0.22 percent, was warned of the dangers of drinking and driving, drank and drove throughout the day, had three near misses, and continued driving over protests of his passengers]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746–747 (*Murray*) [driving wrong way on a freeway with a blood-alcohol level between 0.18 and 0.23 percent]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [crossing into oncoming traffic on two-lane highway with a blood-

15

alcohol level of 0.27 percent]; *People v. Olivas* (1985) 172 Cal.App.3d 984, 989 (*Olivas*) [extremely dangerous driving while under influence of PCP and "negligible" amount of alcohol].)  These opinions have generally relied on some or all of the factors that were present in *Watson*:  "(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving."  (*Autry*, at p. 358.)  However, "courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach."  (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 698.)

Although there is no particular formula to follow under *Watson*, the instant matter presents one crucial, unique fact not present in *Watson* and its progeny.  At the time of the accident killing the victim, Chagolla was not driving her vehicle and had not been driving for 30 minutes.  This is an anomaly under the *Watson* test where the defendant typically is driving at the time of the victim's death.  (See, e.g., *Wolfe*, *supra*, 20 Cal.App.5th at p. 679; *Autry*, *supra*, 37 Cal.App.4th at p. 356; *Murray*, *supra*, 225 Cal.App.3d at p. 738.)  In contrast to the usual *Watson* murder case, the victim here died in an accident over 30 minutes after Chagolla ceased driving.  Moreover, the crash occurred somewhere between half a mile and a mile from where Chagolla's car came to rest on the freeway.  Further, the evidence provided at the preliminary hearing was undisputed that quickly after Chagolla's vehicle came to rest blocking the number 1 and 2 lanes of the I-10, drivers "stopped systematically on their own."  And, when one officer was approaching the scene of Chagolla's accident, he noted "everything was stopped" "within a half mile" of where Chagolla's vehicle came to rest.  Therefore, although Chagolla's act of reckless driving while intoxicated created a potential deadly

16

situation that could have supported, under *Watson*, probable cause of implied malice if a deadly accident occurred while Chagolla was driving, the environment shortly after her vehicle crashed and came to rest on the freeway was somewhat different. That is not to say the driving conditions after Chagolla crashed did not present some danger, but the undisputed evidence showed that the other drivers on the I-10, at least within a half mile of Chagolla's vehicle, had safely come to a stop. Thus, the degree of danger seemed to be, at least for the time being and to some degree, abated.

Nonetheless, a very real risk of injury remained because Chagolla's vehicle blocked traffic on the I-10. In fact, evidence presented at the preliminary hearing emphasized the need to get Chagolla out of her vehicle and that vehicle moved to the side of the freeway. As Officer Rivas testified: "My main concern at that time was getting her out of the vehicle and getting traffic going. Because of the collision and everything had occurred, any traffic behind me has—had already stopped." Moreover, Officer Rivas explained that it would have taken him less than three minutes to push-bumper Chagolla's vehicle off the freeway had Chagolla responded to his first command to exit her vehicle. And after doing so, traffic "would have proceeded through." In other words, after crashing her vehicle and coming to a stop, had Chagolla quickly exited her vehicle, the CHP would have moved that vehicle to the side of the freeway and allowed traffic to proceed as usual, substantially reducing the risk of any additional accident. But Chagolla remained in her vehicle some 45 minutes after it crashed, and the deadly crash occurred 30 minutes into that period. As such, although Chagolla's dangerous driving and subsequent crash created a dangerous condition on the I-10, it was the fact that she remained in her car for so long following that crash that maintained the harmful conditions that made the subject deadly

17

accident here more likely.  Therefore, under *Watson*, we need to be persuaded that the evidence presented at the preliminary hearing regarding Chagolla remaining in her vehicle after her crash on the I-10, "reasonably viewed, exhibited wantonness and a consciousness disregard for life which would support a finding of implied malice." (See *Watson*, *supra*, 30 Cal.3d at p. 295.)  Alternatively stated, did the People provide some evidence that would support a finding of implied malice based on Chagolla remaining in her vehicle despite it blocking the I-10 and continued commands from CHP officers to exit the vehicle?

As a threshold matter, we note that the People point out that the superior court did not address implied malice when ruling on Chagolla's section 995 motion.  Yet, as we set forth *ante*, in reviewing an order granting a section 995 order, we ignore the superior court's ruling and directly review the magistrate's determination. (*People v. San Nicolas*, *supra*, 34 Cal.4th at p. 654.)  And the magistrate stated that he was satisfied that the People had provided enough evidence regarding the issue of "conscious[ ] [dis]regard for human safety" . . . "for purposes of a *Watson* murder." (italics added, underline omitted.)  In their petition, the People do not directly address the issue of implied malice, but instead, they incorporate by reference the arguments they made in their opposition to Chagolla's section 995 motion below.  Those assertions focus entirely on traditional *Watson* murder factors and emphasize Chagolla's erratic and reckless driving.  They do not address the 45 minutes or so Chagolla remained in her vehicle after it came to a stop on the I-10.  Consequently, the arguments are not particularly helpful here. Thus, we consider whether the evidence presented at the preliminary hearing provided sufficient cause to believe Chagolla was guilty of implied malice murder. (See *Abelino*, *supra*, 62 Cal.App.5th at p. 573.)

18

To support a finding of second degree murder based on implied malice, the evidence must establish that the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger. (*Watson*, *supra*, 30 Cal.3d at p. 300.) This conscious disregard for the danger to the life of another distinguishes implied malice from gross negligence, which involves "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*Id.* at p. 296.) "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is . . . killed.' The state of mind of the person who acts with conscious indifferences to the consequences is simply, 'I don't care what happens.'" (*Olivas*, *supra*, 172 Cal.App.3d at pp. 987–988.) Implied malice requires that the defendant actually appreciated the risk involved. (*Watson*, at pp. 296–297.) "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143; see *People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*) ["Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " ' "].)

Here, the act at issue is Chagolla remaining in her vehicle after it came to rest on the I-10. That vehicle was blocking traffic. It came to rest after Chagolla crashed it while engaged in a high speed chase, avoiding CHP officers in pursuit. Chagolla was intoxicated. Clearly, the natural consequences of her remaining in her vehicle under these circumstances were

19

dangerous to life—her car was blocking the freeway, causing traffic to stop. However, we must determine if evidence was presented at the preliminary hearing that Chagolla intentionally remained in her car and knew that her action would endanger the life of others. (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

Here, the evidence presented at the preliminary hearing falls woefully short of establishing that there was probable cause to charge Chagolla with implied malice murder. Specifically, the evidence did not even suggest that Chagolla intentionally remained in her vehicle after it came to a stop or that she appreciated the danger of remaining in the vehicle. In fact, the evidence presented leads to the undeniable conclusion that Chagolla exhibited little awareness of what she was doing and the consequences of her failure to exit her vehicle. For example, after the accident, all the air bags had deployed indicating that Chagolla's vehicle's crash was substantial. Officer Rivas, who had been issuing orders to Chagolla to exit her vehicle, admitted that there was no indication that Chagolla was able to understand or comprehend what he was saying. An officer shot out one of Chagolla's vehicle's windows. Nonetheless, Chagolla did not even respond to that intrusive event. When Officer Moran first observed Chagolla in her vehicle, he noted that she was mumbling incoherently. He stated that her eyes were opening, closing, and rolling back. Moreover, Officer Moran testified that Chagolla exhibited the telltale signs of being under the influence of prescription pain medication: constricted pupils, white coating around her mouth, lethargic, raspy and mumbly voice. And Officer Moran remarked that Chagolla "[j]ust appeared to be like not all there with what was going on." We note that the testimony Officer Moran provided described Chagolla's condition some 45 minutes after her accident and her vehicle coming to rest. The deadly accident occurred about 15 minutes before Officer Moran made these observations.

20

Additionally, Officer Moran's observation that Chagolla was under the influence of prescription pain medication was confirmed by a subsequent blood test. It was found that Chagolla had 902 nanograms per milliliter of oxycodone in her bloodstream—far beyond therapeutic ranges and well above the 600 nanograms that typically cause health problems.

The only other evidence presented at the preliminary hearing regarding Chagolla's actions and mens rea while she remained in her vehicle after the accident was the observation of Officer Fox that he witnessed "slight movement" and "minimal movements inside the vehicle." However, Officer Fox reported seeing this movement four minutes after Chagolla's vehicle crashed, and there is no indication in the record that there was any further movement after that point. This evidence also supports the conclusion that Chagolla was not intentionally choosing to remain in her vehicle or that she was aware of the consequences of doing so.

In arguing that Chagolla "volitionally and intentionally refused to exit the vehicle after the guardrail crash," the People emphasize that she walked with limited assistance to a patrol car, that she did not fall over, and that she was not taken out of her vehicle on a gurney. Yet, the People acknowledge that, at that time, Chagolla "mumbled a little bit and was not speaking coherently, she had very constricted pupils and a white coating around her mouth and lips, she had a raspy voice and was very lethargic, and she was 'kind of out of it on and off, in and out of consciousness.' " As such, the People's argument is somewhat disjointed in that they seem to be arguing that Chagolla "appeared conscious" when she exited the vehicle even though they admit that she was extremely bewildered and incapable of sensible speech. In this sense, the People's contentions support the conclusion that Chagolla was not acting intentionally when she remained in her vehicle after

21

the crash. Certainly, this evidence does not support the conclusion that Chagolla appreciated the danger of remaining in her vehicle after the crash. Rather, the evidence strongly suggests that Chagolla did not know where she was or what she was doing.

Despite the scant evidence supporting probable cause for implied malice murder, the People argue: "In other words, [Chagolla] was exhibiting signs that she was under the influence of drugs; however, while under the influence, she was nevertheless volitionally engaging in a high-speed chase. Likewise, while under the influence, she was volitionally remaining in the vehicle." The People's argument suffers from the fallacy of false equivalency. *Watson* allows implied malice to be inferred under certain circumstances when a defendant unintentionally kills someone while driving while intoxicated. (See *Watson, supra,* 30 Cal.3d at pp. 300–301.) " 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Ibid.*) Thus, the key volitional act under a *Watson* murder is driving. It is easily proven. A prosecutor must simply show that the defendant was driving. However, remaining in a vehicle after a crash is not the same as driving. While driving constitutes taking a particular action and volitional activity (i.e., deciding to drive, pushing on the accelerator, steering the car), remaining in a vehicle is a passive activity. In other words, it is inaction and can be accomplished whether the defendant is conscious or unconscious. For example, if a driver crashes her car, comes to a stop, and passes out, we would not say that the driver was acting volitionally by remaining in her car. Instead, at that point, the driver would be incapable of

engaging in any intentional act. The same is true here based on the evidence presented at the preliminary hearing.

In essence, it appears that the People contend that we may infer implied malice while Chagolla remained in her vehicle based on her reckless driving while under the influence of oxycodone. However, we read nothing in *Watson* or its progeny that supports such an inference. Further, such a conclusion is not warranted on the facts of this case where the accident occurred at least a half mile away and 30 minutes after Chagolla's vehicle crashed and came to a stop, and where there is no indication that Chagolla intentionally remained in her vehicle or appreciated the consequences of remaining in her vehicle. Accordingly, we do not find that the superior court erred in granting Chagolla's section 995 motion as to count 1.[5]

We next turn to the People's argument that the superior court erred in granting Chagolla's 995 motion as to count 2 (violation of Vehicle Code section 2800.3). The People assert that both the superior court and the magistrate erred by reading the statute as requiring Chagolla to be driving at the time of the second accident. To this end, the People emphasize that to be

---

[5] The parties dedicate much of their briefing before this court to the issues of whether Jeremy's negligence was an intervening independent or dependent cause of the victim's death and if the second accident was reasonably foreseeable. They make these arguments to address whether proximate cause exists as to count 1. However, we need not resolve this dispute to decide the issue before us. Proximate cause requires a deliberate act performed by the defendant with knowledge that her conduct endangers the life of another and that the act exhibits conscious disregard for life. Then that knowing act must have been a substantial factor contributing to the victim's death for proximate cause to exist to support an implied murder malice charge. (See *Reyes*, *supra*, 14 Cal.5th at p. 988.) As we discussed *ante*, the evidence proffered at the preliminary hearing did not establish the required actus rea or mens rea that is foundational to the concept of proximate cause.

23

charged with a violation of Vehicle Code section 2800.3, a defendant must meet the requirements of violating Vehicle Code section 2800.1. Thus, as relevant here, when a violation of Vehicle Code section 2800.1 "proximately causes death to a person," the crime is elevated to a felony. (Veh. Code, § 2800.3, subd. (b).)

Vehicle Code section 2800.1, subdivision (a) provides in pertinent part that "[a]ny person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor[.]" In turn, Vehicle Code section 2800.3, subdivision (b) states: "Whenever willful flight or attempt to elude a pursuing peace officer in violation of Section 2800.1 proximately causes death to a person, the person driving the pursued vehicle, upon conviction shall be punished by imprisonment in the state prison for a term of 4, 6, or 10 years." The People contend that the plain language of these statutes does not require the operation of a vehicle to coincide in timing with the crash resulting in the victim's death. Instead, the operation of the vehicle must coincide with the willful fleeing or otherwise attempting to elude a pursuing peace officer's vehicle as long as that act proximately causes the victim's death.

Even if we were to accept the People's reading of the subject sections of the Vehicle Code, we would not find that the superior court erred. Here, as we discussed *ante*, the deadly accident occurred about 30 minutes after Chagolla crashed her vehicle and came to rest on the I-10, stopping traffic. That traffic safely came to a stop at least a half mile from Chagolla's vehicle well before Chagolla exited her car. Chagolla remaining in the vehicle thus maintained a dangerous condition, giving rise to the deadly accident. However, the evidence at the preliminary hearing did not establish that

24

Chagolla intentionally remained in her car after it crashed and knew that remaining in the vehicle would endanger the life of another.  Without establishing those fundamental facts, the People cannot show Chagolla's act of remaining in her car proximately caused the victim's death.  Therefore, the People have not persuaded us that the superior court erred in granting Chagolla's section 995 motion as to count 2, even if we accept their interpretation of the statute.

## DISPOSITION

The People's request for relief is denied.


HUFFMAN, Acting P. J.

I CONCUR:


KELETY, J.

25

DO, J., Concurring.

Under the influence of a stunning quantity of oxycodone, Diana Contreras Chagolla crashed her vehicle after leading police on a dangerous 35- to 40-mile, high-speed chase and came to a complete rest in the middle of the Interstate 10 highway. With Chagolla immobilized behind the wheel, and 8 to 10 California Highway Patrol officers in control of her crash site, oncoming traffic came to a "systematic[ ]" stop on its own and backed up for a long stretch down the highway. *Thirty minutes later and a half-mile to a mile away, at the tail-end of the stopped traffic*, Jeremy S. — a distracted driver operating an 18-wheeler semi-trailer truck — rear-ended another 18-wheeler semi-trailer truck; jackknifed out of control and caught on fire when he perforated his fuel tank; struck a compact passenger vehicle (causing it to crash into a guardrail); and ultimately collided into another 18-wheeler semi-trailer truck driven by Pierre F. Pierre's truck became fully engulfed by fire, and he died of severe burns. All three vehicles Jeremy struck were either at a complete stop or were coming to a stop.

On these facts, I agree with the majority that Chagolla cannot be held liable for the murder of Pierre, and I join the majority in denying the People's petition for mandate. I write separately for two reasons.

First, I disagree with the majority that there is insufficient evidence Chagolla harbored implied malice to support a second degree murder charge. In my analysis, second degree murder is not available to the People because the evidence at the preliminary hearing was legally insufficient to establish proximate cause. This is the rare case in which the undisputed evidence reveals the cause of the victim's death was too remote and attenuated from any act by the defendant such that a court may properly decide proximate

cause is lacking. Specifically, I would conclude the high probability of death — that is required for an implied malice murder and that was initially created by Chagolla's driving — had dissipated by the time of the second accident such that there was no longer an operative cause in fact sufficient to find proximate cause. I would further conclude the motorists who encountered the traffic back-up 30 minutes after Chagolla's crash and more than a half-mile down the highway were beyond the foreseeable scope of risk for murder liability.

Second, I am concerned the majority's analysis of implied malice may be misread to preclude a *Watson*[1] second degree murder charge in circumstances where it could be appropriate. It is true "the key volitional act under a *Watson* murder is driving" (maj. opn., at p. 22), but it does not follow that liability for the high risk of death from a person's decision to drive dangerously or while impaired is automatically cut off when a dangerous or impaired driver passes out or becomes immobilized. One foreseeable consequence of driving under the influence is precisely that the driver will black out, lose control of the car, and then kill another motorist, either as the vehicle continues forward with no one steering or stops in a location where it creates a deadly road hazard that other motorists must try to avoid. Thus, while I agree that Chagolla's inability to leave her car is important to the analysis, I see this to be a factor pointing to the lack of proximate cause. It is not dispositive on the question of whether she harbored the mental state of implied malice.

---

1      *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

2

# I.

*The Evidence Was Sufficient To Establish Implied Malice*

Unlike the majority, I would conclude the People's evidence at the preliminary hearing was sufficient to show probable cause on implied malice. Murder is committed with implied malice when an act is "deliberately performed by a person who knows that his conduct endangers the life of another." (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) It is well settled that exceptionally hazardous driving that causes a fatal traffic collision may support a conviction for second degree murder based on the mental state of implied malice.

A high-speed flight from police in an automobile can present such a high probability of death that there is probable cause to believe the driver harbored implied malice. (*People v. Lima* (2004) 118 Cal.App.4th 259, 265–267 (*Lima*) [collecting cases]; see also *People v. Canizalez* (2011) 197 Cal.App.4th 832, 842–843 [racing]; *People v. Contreras* (1994) 26 Cal.App.4th 944, 952–955  [speeding]; *People v. Moore* (2010) 187 Cal.App.4th 937, 939–942 (*Moore*) [road rage].) Similarly, a driver reasonably may be held to exhibit conscious disregard for life if he " 'wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed.' " (*Watson, supra,* 30 Cal.3d at pp. 300–301.)

Applying these principles, a jury could readily conclude Chagolla demonstrated a conscious disregard for the lives of her fellow motorists at the point in time when she decided to lead police on a 35- to 40-mile chase at speeds in excess of 100 miles per hour on a highway full of vehicles while under the influence of oxycodone. There was ample evidence she was awake

3

and functioning with sufficient faculties to have the requisite mens rea. The evidence at the preliminary hearing showed Chagolla was conscious and acting volitionally as she wove in and out of traffic. She was able to drive the car with precision, deliberately engaging in evasive movements as she passed other cars. She purposefully drove on the shoulder to keep going forward when necessary. She was alert and dexterous enough to avoid a collision in tight traffic for more than 20 minutes. Such extreme driving created an obvious, life-threatening risk of a deadly, multi-car crash during the entire course of the extended car chase. There's more. Officer Guillermo Bermudez specifically lectured Chagolla about the risk of causing a deadly accident when he stopped her for reckless driving two years earlier.

Overwhelming evidence provided probable cause to believe Chagolla had the required subjective awareness to consciously disregard the life-threatening risk that "collisions, injuries, and deaths would occur in the course of the chase." (*People v. Harris* (1975) 52 Cal.App.3d 419, 427; *Watson, supra,* 30 Cal.3d at pp. 300–301.) The majority and I agree she easily could have killed many people during the course of her impaired driving. (Maj. opn., at pp. 16–17.)

In my view, however, there was also ample evidence Chagolla disregarded another manifest risk: that she would pass out from the dangerous quantity of oxycodone in her system[2] or as a result of injuries caused by the way she maneuvered the car, and that her unmanned car would become a deadly road hazard. Under the right circumstances, a post-driving accident that occurs because a driver is no longer capable of volitional

---

[2]    Although therapeutic ranges are between 5 and 50 milligrams, Chagolla had 902 nanograms per milliliter of oxycodone in her system, enough to be fatal.

4

conduct can support a *Watson* murder charge. (See *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1356, 1358–1359 [evidence was sufficient to establish implied malice where defendant admittedly "fell asleep at the wheel" as a result of methamphetamine withdrawal, lost control of the vehicle, and killed two pedestrians].) The risk of passing out and killing someone — either by losing control of the wheel or suddenly stopping and blocking the road — is a foreseeable and self-evident consequence of driving impaired like Chagolla. (*Moore, supra,* 187 Cal.App.4th at p. 941 ["It takes no leap of logic for [a] jury to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk]".)

For this reason, I disagree with the majority's opinion to the extent it suggests a *Watson* implied malice murder charge can only be supported "if a deadly accident occurred while [the defendant] was driving." (Maj. opn. at pp. 16–17.) As the majority observes, " 'there is no particular formula for analysis of vehicular homicide cases.' " (Maj. opn. at p. 16.) The determination of whether the *Watson* standard for second degree murder applies is a "case-by-case process." (*People v. Murray* (1990) 225 Cal.App.3d 734, 749.) Thus although the key volitional act in *Watson* murder cases reported to date is driving, I see no logical reason to conclude that liability for the high risk of death from a person's decision to drive dangerously or while impaired is automatically cut off when a dangerous or impaired driver passes out or becomes immobilized.

Because I conclude there was sufficient probable cause to find that Chagolla consciously disregarded the risk she would kill someone as a result of becoming incapacitated from her impaired and dangerous driving, I reach the question of proximate cause. As I explain next, the People's proof of

5

proximate cause fails, even under the lenient burden that applies at a preliminary hearing.

## II.

*Implied Malice Murder Cannot Be Based on a Death That Is Anything Less Than Highly Probable*

Implied malice murder cannot be based on a death that is anything less than highly probable. I begin with this important principle because, in my analysis of proximate cause, it is the distinct nature of this risk element that compels the conclusion the People did not establish causation as a matter of law.

Murder includes both actus reus and mens rea elements. (*People v. Carney* (2023) 14 Cal.5th 1130, 1137–1138 (*Carney*).) To satisfy the actus reus element of implied malice murder, the " 'natural and probable consequences' " of the defendant's act must be " 'dangerous to life,' " meaning there is a " ' "high degree of probability that it will result in death." ' " (*Reyes, supra,* 14 Cal.5th at p. 989; accord *People v. Knoller* (2007) 41 Cal.4th 139, 157 (*Knoller*) [" 'high probability of death' " is the objective component of implied malice that "asks whether the defendant's act or conduct 'involves a high degree of probability that it will result in death' "[3]].) A high probability of great bodily injury is inadequate. (*Knoller*, at p. 156.) The mere possibility of death is inadequate. (*Reyes,* at pp. 989–990.) This is true even in a *Watson* implied malice murder. (*Watson, supra,* 30 Cal.3d at p. 300 ["malice may be implied when defendant does an act with a high probability that it will result in death"].)

---

[3] The subjective component of implied malice "requires only that a defendant acted with a ' "conscious disregard for human life." ' " (*Knoller, supra,* 41 Cal.4th at p. 157.)

6

Although certainty of death is not required, the policy reason for imputing malice in an implied malice murder is specifically based on the perpetrator's disregard of a very high likelihood of death.  (*Reyes, supra,* 14 Cal.5th at p. 989; *People v. Roberts* (1992) 2 Cal.4th 271, 316–317 (*Roberts*).)  Because the perpetrator's actions are so very likely to kill someone, we presume no moral person would disregard them.  Therefore, it is appropriate as a matter of policy to equate the perpetrator's state of mind of conscious disregard for life with the actual specific intent to kill that is otherwise required to impose liability for murder.  (See *Roberts*, at pp. 316–317 ["moral culpability is found in homicide cases when, despite the lack of any intent to kill, the consequences of the evil act are so natural and probable that liability is established as a matter of policy"]; Rest.2d, Torts § 282 [explaining that increasingly culpable degrees of recklessness eventually approach and finally become indistinguishable from intentional conduct].)

Thus "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*Reyes, supra,* 14 Cal.5th at p. 989.)  "[A]cts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement." (*Ibid.*)

III.

*General Principles on Proximate Cause*

An act of the defendant " 'must be the proximate cause of death' " to satisfy the actus reus element of murder. (*Carney, supra*, 14 Cal.5th at pp. 1137, 1138.)  Here, proximate cause must be assessed in light of the correct risk element of implied malice murder — a high probability of death — not with the more familiar risk element at issue in civil cases, an

7

unreasonable risk of harm. It is this critical difference that explains why the People failed to demonstrate sufficient probable cause on the element of proximate cause. When the correct risk element for implied malice murder is considered, it follows that the motorists more than a half-mile away, approaching an unremarkable traffic back-up 30 minutes after Chagolla crashed her car, were not within the foreseeable scope of risk for murder liability. And the high probability of death initially created by Chagolla's driving had dissipated by the time of the second accident down the highway such that there was no longer an operative cause in fact sufficient to find she proximately caused the victim's death. To explain my conclusions, I first discuss applicable principles of proximate cause.

As jurors are instructed in homicide cases, "[t]he criminal law has its own particular way of defining cause." (CALJIC. No. 340.) A " 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*), citing CALJIC No. 3.40.)

"Broadly speaking, proximate cause consists of two components. One is cause in fact (also called actual or direct causation). ' " 'An act is a cause in fact if it is a necessary antecedent of an event' " ' . . . and it is commonly referred to as the 'but-for' cause of death." (*Carney, supra,* 14 Cal.5th at p. 1138, citation omitted.)

The second component of proximate cause focuses on public policy considerations. (*Carney, supra,* 14 Cal.5th at p. 1138.) " ' "Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional 'limitations on liability other than

8

simple causality.' . . . 'These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy.' " ' " (*Ibid.*)  The question here is "when and how to limit liability when cause and effect relationships logically continue to infinity."  (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1057 (dis. opn. of Kennard, J.).)

A.    *Cause in Fact:  When Forces "Come To Rest in a Position of Apparent Safety"*

An event may have more than one cause in fact.  Where, as here, there is evidence that two causes may have contributed concurrently to a death, " ' "[t]o be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' "  (*Carney*, *supra*, 14 Cal.5th at p. 1138.)  But a cause is concurrent *only if* it was (1) " ' "*operative at the time of the death*," ' " and (2) " ' "acted with another cause to produce the death." ' "  (*People v. Sanchez* (2001) 26 Cal.4th 834, 847 (*Sanchez*), italics added; accord *Carney*, at pp. 1138–1139.)

The requirement of an operative cause at the time of the death includes the concept that a cause in fact will not be found to be proximate beyond the point at which a force set in motion has " 'come to rest in a position of apparent safety.' "  (*People v. Caldwell* (1984) 36 Cal.3d 210, 219–220 (*Caldwell*), quoting Perkins & Boyce, Criminal Law (3d ed. 1982) Imputability, ch. 6, § 9, pp. 780–781 (Perkins & Boyce).)  Importantly, the principle of apparent safety is not limited to situations in which a force set in motion "come[s] to rest" in a literal fashion.  (Perkins & Boyce, at pp. 780–781.)  "The reference to 'apparent safety' is merely to permit situations to be considered in terms of common sense rather than

9

philosophical abstraction." (*Id.* at p. 781.) And the word " 'force' is not used in a scientific sense." (*Id.* at p. 780, fn. 72.)

The principle of apparent safety is not commonly encountered, but it was recognized by our high court in a case involving a high-speed car chase and a conviction for implied malice murder. (*Caldwell, supra,* 36 Cal.3d at pp. 214, fn. 1, 219–220.) In *Caldwell,* two armed men (Washington and Belvin) robbed a fast-food restaurant while Caldwell waited as the driver in a getaway car. (*Id.* at pp. 214, 218.) Sheriff's deputies arrived, and the two robbers fled to Caldwell's car. Caldwell attempted to evade the deputies by driving 5 to 10 miles on a twisting road without stopping at stops signs and red lights at speeds approaching 70 miles per hour. (*Id.* at p. 215.) When Washington in the front passenger seat pointed a shotgun at them, the deputies rammed Caldwell's car head-on. The shotgun "flew out" of Washington's hand onto the street. (*Ibid.*) The car came to rest against the patrol car's front bumper. (*Ibid.*)

The deputies got out immediately and took cover with guns drawn. The three robbers got out of their car too. Caldwell and Belvin had guns in hand, though Caldwell did not point it at the deputies. (*Caldwell, supra,* 36 Cal.3d at pp. 215, 218.) The deputies gave the robbers an opportunity to drop their guns and surrender. (*Id.* at p. 219.) They did not, and a shootout ensued. Caldwell's accomplice, Belvin, was killed. (*Id.* at pp. 215–216, 219.) Caldwell was convicted of second degree murder. (*Id.* at p. 214, fn. 1.)

Significantly, Caldwell was convicted of second degree murder under the rule of *People v. Gilbert* (1965) 63 Cal.2d 690, 704, reversed on other grounds in *Gilbert v. California* (1967) 388 U.S. 263, which required the prosecution to prove Caldwell or a surviving accomplice intentionally committed an act that had a high probability of resulting in death, *and* that

10

his victim or a police officer killed in reasonable response to the act. (*Caldwell*, *supra*, 36 Cal.3d at p. 216, fn. 2; *id.* at p. 226 (dis. opn. of Bird, C.J.).) Unlike the inquiry here, where simple implied malice is at issue, the central question for liability under the *Gilbert* rule is whether the defendant's or his accomplice's conduct is sufficiently provocative of lethal resistance to support a finding of implied malice.[4] (*Ibid.*)

The Supreme Court readily found that Caldwell acted with implied malice in his dangerous getaway driving. (*Caldwell*, *supra*, 36 Cal.3d at p. 218; *id.* at p. 228 (dis. opn. of Bird, C.J.).) However, the Court grappled with what it termed a "serious issue of proximate causation," namely whether Caldwell's malicious driving and Washington's aiming of the shotgun was a proximate cause of the shootout that followed and thus Belvin's death. (*Id.* at pp. 218, 219–220.)

As noted, and relevant to the apparent safety principle, the deputies gave the robbers an opportunity to surrender after the car chase ended. (*Caldwell*, *supra*, 36 Cal.3d at p. 219.) At the time, Caldwell's car was at rest, trapped between two police cars. And Washington's shotgun was lying on the street. The break in time lasted about five to forty seconds before deputies fired upon the robbers. (*Id.* at p. 216.)

---

[4] The language used in *Gilbert* and *Caldwell* to articulate the mens rea component of implied malice is overbroad under current law, because it may improperly be read to allow for malice to be imputed in some circumstances. (See *People v. Concha* (2009) 47 Cal.4th 653, 662–663 [clarifying that a defendant must "personally act with malice" in order to be liable for provocative act murder]; *People v. Lee* (2023) 95 Cal.App.5th 1164, 1177–1182; but see *People v. Antonelli* (2023) 93 Cal.App.5th 712, 719–721, review granted Oct. 18, 2023, S281599.) This discrepancy does not affect the analysis of proximate cause.

The *Caldwell* majority acknowledged these facts presented "[a] difficult problem" in their analysis of proximate cause but ultimately decided that "[t]he lull in the action" was too precarious and short-lived to break the causal chain. (*Caldwell*, *supra*, 36 Cal.3d at pp. 219–220.) The majority concluded: "Though the deputies did not begin firing immediately, but gave the suspects an opportunity to drop their guns, it can hardly be said that *whatever provocative force* the high-speed chase and Washington's apparent attempt to shoot two policemen may have had dissipated, or 'come to rest in a position of apparent safety.' " (*Id.* at pp. 219–220, italics added, quoting Perkins & Boyce, *supra*, at pp. 780–781.)

Dissenting in this close case, Chief Justice Bird found the car and shotgun had " '[come] to rest in a position of apparent safety,' " and any threat from the driving and shotgun pointing "had completely dissipated" by the time of the shooting. (*Caldwell*, *supra*, 36 Cal.3d at pp. 228–229 (dis. opn. of Bird, C.J.).) She concluded no reasonable jury could find that Caldwell's driving or Washington's aiming of the shotgun proximately caused their accomplice's death. (*Id.* at p. 228.)

There is one important distinction between this case and *Caldwell*. In *Caldwell*, under the *Gilbert* rule, the death of Caldwell's accomplice had to be the "proximate[ ] result from *provocative conduct* by one of the felons which exhibits a conscious disregard for life and a high probability of resulting in death." (*Caldwell, supra,* 36 Cal.3d at p. 214, italics added.) For this reason, when assessing whether there was an operative cause, the Supreme Court addressed whether the *provocative nature* of the forces set in motion by Caldwell's dangerous getaway driving and Washington's aiming of the shotgun had dissipated by the time of the shootout. (*Id.* at pp. 219–220; *id.* at pp. 228–229 (dis. opn. of Bird, C.J.).) Here, by contrast, the simple implied

12

malice charge requires conduct that creates a high probability of death and nothing more, i.e., the conduct does not in addition need to be provocative. Thus, when assessing whether there was an operative cause at the time of the second accident in the instant case, the relevant inquiry will be whether the high probability of death presented by forces set in motion by Chagolla had dissipated.

No other California case has discussed the principle of apparent safety. But our high court squarely addresses it in *Caldwell*. And although the facts of *Caldwell* are not on all fours with Chagolla's case, in my view, a similar problem with proximate cause presents in this case. I discuss this in further detail in Section IV below.

B.     *Public Policy Considerations: "Scope of Risk" for Implied Malice Murder*

As explained by our high court, "The limitation on liability under the second component of proximate cause comes down to the question of foreseeability." (*Carney, supra*, 14 Cal.5th at p. 1139.) Here, "[t]he criminal law . . . is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*Roberts, supra,* 2 Cal.4th at p. 319.) Notoriously, "there is no bright line demarcating a legally sufficient proximate cause from one that is too remote." (*Id.* at p. 320, fn. 11.) To illustrate the assessment of natural and probable consequences in the absence of a bright-line rule and in the context of implied malice murder, Justice Mosk provides the following example: "Shots that cause a driver to accelerate impulsively and run over a nearby pedestrian suffice to confer liability [citation]; but if the driver, still upset, had proceeded for several miles before killing a pedestrian, at some point the required causal nexus

13

would have become too attenuated for the initial bad actor [(i.e., the shooter)] to be liable even for manslaughter; *much less* for first degree murder." (*Id.* at p. 321, italics added.)

The boundary between legal cause and one that is too remote has traditionally been expressed in terms of "foreseeability." As stated by our high court, "A result cannot be the natural and probable cause of an act if the act was unforeseeable." (*Roberts, supra,* 2 Cal.4th at pp. 321–322.) And for murder liability, "if the eventual victim's death is not the natural and probable consequence of a defendant's act, then liability cannot attach." (*Id.* at p. 321.) More recently, "[t]he issue of proximate causation is increasingly being viewed in terms of the scope of the risk created by the wrongdoer's conduct." (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1333 (*Brady*); see *Paroline v. United States* (2014) 572 U.S. 434, 445 (*Paroline*) ["Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct."].) To some extent, foreseeability and scope of risk are slightly different ways of explaining the same concept. (Cf. *Brady*, at p. 1333, citing 1 Dobbs, The Law of Torts (2001) §§ 186–187, pp. 460–464 ["the language of foreseeability is a short hand expression intended to say that the scope of the defendant's liability is determined by the scope of the risk" he created].)

Whether expressed as foreseeability or scope of risk, the natural and probable consequences component of proximate cause in criminal cases includes the concepts of a class of foreseeable victims and a physical danger zone. (See *Roberts*, *supra*, 2 Cal.4th at pp. 318–319.) However, I have not found a direct articulation of these concepts tailored to the specific risk element at issue in a California implied malice murder case: a high probability of death.

14

In civil negligence actions, these concepts are defined and delineated based on the applicable risk element: an "unreasonable risk of harm." (Rest.2d Torts, § 282; *Dillon v. Legg* (1968) 68 Cal.2d 728, 739.) The Restatement Second of Torts explains these concepts using the applicable risk element as follows: "In order for [an] actor to be negligent with respect to [another], his conduct must create a recognizable risk of harm to the other individually, or to a class of persons — as, for example, all persons within a given area of danger — of which the other is a member. If the actor's conduct creates such a recognizable risk of harm only to a particular class of persons, the fact that it in fact causes harm to a person of a different class, to whom the actor could not reasonably have anticipated injury, does not make the actor liable to the persons so injured." (Rest.2d Torts, § 281, com. c.) The Restatement Third of Torts similarly explains, "[C]onduct is negligent when it creates an unreasonable risk of harm to some general class of persons. If the plaintiff is not within that class toward whom the defendant is negligent, the injury does not give rise to liability. (See Rest.3d, Torts: Liability for Physical and Emotional Harm §§ 6, 29.)" (6 Witkin Summary of Cal. Law (11th ed. 2017) Torts, § 963, p. 114.)

The criminal law relies heavily on civil law principles when addressing proximate cause. (See *Brady*, *supra*, 129 Cal.App.4th at p. 1324; *Carney*, *supra*, 14 Cal.5th at p. 1138.) The details of those principles tend to be more developed in tort law, and many civil law principles of causation are coextensive with their criminal law counterparts. (*Paroline*, *supra*, 572 U.S. at pp. 444–445; *People v. Dawson* (2009) 172 Cal.App.4th 1073, 1093.) But not all principles can be imported into the criminal law and used without adjustment and realignment. (1 LaFave, Substantive Criminal Law (3d ed. 2018), § 6.4(c), pp. 639–640 (LaFave).) This is true here.

15

As explained by the authors of a respected treatise, "the boundary lines of proximate cause . . . vary according to the jural consequences of the particular kind of case involved. . . . 'Legal causation reaches further' in some types of cases than it does in others. It reaches further in tort actions based upon intentional harm than in those resulting from negligence, and neither of the boundaries so established is necessarily controlling in other types of cases, such as actions for breach of contract, those under Workmen's Compensation Acts, or criminal prosecutions. (Perkins & Boyce, *supra*, p. 776, fns. omitted.)

As further explained by another respected author, the reason the boundary lines of proximate cause must vary according to the jural consequences is to ensure criminal sanctions are not unfairly imposed when "death results from a series of events too extraordinary or too dependent on the acts of another." (LaFave, *supra*, § 6.4(c), p. 640.) "The problems of legal causation arise in both tort and criminal settings, and the one situation is closely analogous to the other. Although the courts have generally treated legal causation in criminal law as in tort law, on principle they do not have to, for the issue is not precisely the same in the two situations. In tort law, it would seem, one might logically require one who actually injured another . . . to pay for the damage actually caused without regard to the likelihood or unlikelihood of the particular result achieved, on the theory that of the two of them, he, rather than the innocent victim, should bear the cost. . . . [¶] But with crimes, where the consequences of a determination of guilt are more drastic (death or imprisonment, generally accompanied by moral condemnation, as contrasted with a mere money payment) it is arguable that a closer relationship between the result achieved and that intended or hazarded should be required." (*Id.*, at pp. 639–640.)

16

It is true that in civil negligence actions, proximate cause has a very far reach. "One may be held accountable for creating even ' "the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." ' " (*Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57.) By contrast, as previously explained, to support an implied malice murder charge, the defendant's conduct must carry a high probability of death. (*Reyes, supra,* 14 Cal.5th at p. 989.) Applying the principles explained by leading commentators, our proximate cause analysis must therefore be undertaken using the heightened, more specific risk element that applies to implied malice murder. The reach of proximate cause in a murder case must be narrower and limited to the consequences of a more restricted scope of risk than " ' "the risk of a slight possibility of injury" ' " found in a tort case. (*Bigbee*, at p. 57.) It makes no sense, and it is not commensurate with liability for second degree murder, to make the reach of murder liability coextensive with the reach of the "unreasonable risk of harm" that applies in civil negligence actions. Doing so would allow a defendant to be found guilty of murder based upon a death which is less than highly probable. But it is appropriate to draw on civil law principles as a model.

Using the risk element specific to the jural consequences of murder, and drawing on the definitions used in negligence actions, the scope of risk for implied malice murder must extend only to the class of persons who are foreseeably subject to a high probability of death by the defendant's conduct and only with respect to those risks or hazards whose likelihood made the conduct potentially deadly. (Cf. Rest.2d Torts, § 281, com. c; Rest.3d Torts, § 29, coms. j, n.) Explained another way, in order for a defendant to be guilty of implied malice murder, her conduct must create a high probability of death to the other person individually, or to a class of persons — as, for example, all

17

persons within a given area of danger — of which the other person is a member.  (Cf. Rest.2d Torts, § 281, com. c; Rest.3d Torts, § 29, coms. j, n.)

C.    *Summary of Principles*

To summarize, the two components of proximate cause in homicide cases are:  (1) cause in fact, which requires the defendant's conduct to be an operative and substantial factor contributing to the death, and (2) a set of policy considerations, which, relevant here, limit liability to that which is the direct, natural and probable consequence of the defendant's act.  (*Carney, supra,* 14 Cal.5th at p. 1142.)

And the requirement of an operative cause at the time of the death includes the concept that a cause in fact will not be found to be proximate beyond the point at which a force set in motion has come to rest in a position of apparent safety, and this principle is based on common sense, not a strict interpretation of the laws of physics.  The risk element for implied malice murder also differs significantly from the one typically at issue in civil cases. The analysis of proximate cause for implied malice murder liability must accordingly take the significantly narrower scope of risk into account.

IV.

*Proximate Cause Is Lacking as a Matter of Law*

Proximate cause is usually a question for the jury.  (*Roberts, supra,* 2 Cal.4th at p. 320, fn. 11; *Brady, supra,* 129 Cal.App.4th at p. 1326.)  But there are cases where the "undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus." (*Roberts,* at p. 320, fn. 11.)  This is such a case.

As we have seen, the scope of risk for implied malice murder extends only to the class of persons who are foreseeably subject to a high probability of death by the defendant's conduct and only with respect to those risks or

18

hazards whose likelihood made the conduct potentially deadly. (Cf., Rest.2d Torts, § 281, com. c; Rest.3d Torts, § 29, coms. j, n.) This is because, to support an implied malice murder charge, the defendant's conduct must carry a high probability of death, and it is the consequences of that specific risk which must foreseeably result in death. Any other interpretation would allow a defendant to be found guilty of murder based upon a death which is less than highly probable.

Here, it was foreseeable in the generalized sense of foreseeability that Chagolla's dangerous driving could result in backed-up traffic leading to a rear-end collision even many hours and many miles further away. But such an event was beyond the scope of risk applicable to murder, which requires that death be highly probable. Chagolla's driving foreseeably created a high probability of death for all the motorists in her way as she sped down the highway, for the officers who pursued her, and for the motorists who had to brake suddenly in the immediate aftermath of her collision with the guardrail as she spun out of control and blocked the highway. (See e.g. *Lima, supra,* 118 Cal.App.4th at pp. 265–267.) They were all members of the class of persons for whom death was highly probable. But the motorists who encountered the resulting traffic stoppage more than a half-mile away and a half hour later were not. Chagolla's liability for murder was not immediately cut off when she could no longer act volitionally, but it did not extend forever. The facts presented at the preliminary hearing left no room for disagreement on this point.

As we have also seen, in order to be an operative cause in fact for purposes of implied malice murder liability, the forces set in motion by a defendant must continue to present a high probability of death. Murder charges do not lie based on the mere possibility of death nor an elevated risk

19

of injury. A conviction for second degree murder must be based on acts and a situation that present a " ' "high degree of probability" ' of death." (*Reyes, supra,* 14 Cal.5th at pp. 989–990.) If the level of risk has abated to the point where the forces present an unreasonable risk of harm, but no longer present a high probability of death, a defendant may be liable in tort for injuries that occur at that point in time. But the defendant can no longer be liable for murder.

Here, there is no question Chagolla's driving set in motion the chain of events that led to the highway stoppage as one car after another was forced to come to a halt because her car was blocking two lanes of traffic. But there is also no question the high probability of death had dissipated by the time of the second accident, 30 minutes later and more than a half-mile down the highway. Reasonable minds might disagree as to whether the forces still presented an unreasonable risk of harm for purposes of civil liability, although the weight of authority is to the contrary.[5] But they no longer

---

[5]  In 2007, a Kansas court of appeals reviewed and analyzed a large, nationwide compilation of civil negligence cases involving "follow-on automobile accidents," where the question presented was whether the negligence of a motorist causing a first accident was the proximate cause of a second accident. (*Hale v. Brown* (Kan.Ct.App. 2007) 38 Kan.App.2d 495, 500, affd. (2008) Kan. 320.) The takeaway from the court's review was that, "[c]ollectively, these cases support the conclusion . . . that follow-on accidents caused by the distraction of an initial wreck or inattention of a later driver are not sufficiently probable to support probable cause: 'Rear end collisions although a foreseeable *possibility* from such a slow-down of traffic, are not a likely or probable consequence at each one.' " (*Id.* at p. 502.)

See also *Ready v. RWI Transportation, LLC* ( Miss. 2016) 203 So.3d 590, 594 [The defendant "was unquestionably culpable for the initial accident, but to find that he is also culpable for an accident that occurs almost an hour after his accident and 3/4 of a mile behind him is out of proportion to his duty as a driver. . . . If an accident so removed by space, distance, and time can be viewed as foreseeable, then it would allow recovery

presented a high probability of death, as a matter of law.  Explained another way, while a highway back-up certainly must be taken seriously, and death was still a *possibility*, death was no longer *highly probable* in the specific legal sense that is required to impose liability for implied malice murder.

By the time of the second accident that killed Pierre, traffic had been slowing and stopping for 30 minutes.  Officer Steven Rivas explained, "because of the time delay, everybody that was coming was stopped systematically on their own."  In that time, hundreds of cars had safely navigated the back-up without incident.[6]

Officer James Moran had run a traffic break as he approached Chagolla's crash site to slow traffic behind him but when he "got to within

'that has no sensible or just stopping point.' "]; *Sherman White & Co. v. Long* (Tenn. 1959) 205 Tenn. 295, 304–305 ["A string of automobiles, two miles long, had stopped because of the excessive blast.  All were safe from harm.  It seems to us inconceivable that the contractor, or any reasonable person, should foresee that the last car in the line should be damaged by a negligent motorist who suddenly appeared upon the scene and crashed into the last car in the line."]; *Donegan v. Denney* (Ky. 1970) 457 S.W.2d 953, 958 ["Pepsi's original negligence" was not a proximate cause of the five-car collision "in light of so many instances in which motorists had safely stopped between the site of Pepsi's negligence and the locale of the five-car collision."]; but see *Smith v. Commercial Transp., Inc.* (Ga.Ct.App. 1996) 220 Ga.App. 866, 868 ["A jury could conclude that when one negligently turns over a tractor-trailer full of produce, it is reasonably foreseeable that the time required to clear it and the resulting traffic back-up will be immense."].

[6]     Officer Eric Pena estimated it was approximately a half-mile to a mile between Chagolla's and Jeremy's crash sites.  Based on 5,280 feet in a mile, a rough estimate of the number of cars in one lane of the half-mile to mile long highway backup is 105 to 211 cars.  This estimate is based on an average car length of 15 feet and a generous estimated space of 10 feet between each car.  I recognize that tractor trailers and other larger vehicles were also on the highway.  Since there were three traffic lanes, however, it is clear that (at minimum) hundreds of vehicles had come to a safe stop.

21

a half mile, everything was stopped already." Police were in command of the scene. Chagolla was immobilized and had been isolated by police. She was no longer driving or otherwise contributing further to the situation. The improbable reason for the continued back-up was now the unusual way Chagolla's vehicle airbags had deployed. Police said they would have removed Chagolla's vehicle from the road immediately, but the airbags had settled in such a way that they were unable to see whether she had a weapon. The problem persisted until police decided to deflate the airbags by shooting them with a less-lethal gun and extracted Chagolla from her car 45 minutes after she had crashed.

Meanwhile, traffic was systematically slowing and coming to a stop as it does for any number of ordinary, everyday situations: rush hour, construction, storm debris in the road, a truly accidental collision. Hundreds of cars stretching for more than a half-mile had come to rest safely over the course of about 30 minutes. There was no evidence the three vehicles that reached the highway back-up, moments before Jeremy arrived, had any problem stopping. To the contrary, they all stopped without incident. The driver of the 18-wheeler semi-trailer truck Jeremy first hit not only had time to turn on his hazard lights to warn of the stopped traffic, but he also had time to "brace[ ] himself for an impact" as he watched Jeremy's tractor trailer "rapidly approaching" the rear of his truck.

This was the situation Jeremy encountered when, in contrast to all the vehicles that preceded him for more than a half-mile, he plowed his tractor trailer into the line of cars ahead. The situation was hazardous. It was caused by forces set in motion by Chagolla's driving as a matter of physics. But, at this time, the foreseeable risk of harm created by Chagolla was no longer one where death was highly probable.

22

To be clear, a high probability of death with respect to other drivers was certainly present when Chagolla's car ricocheted off the guard rail and suddenly stopped on the highway. The collision blocked two lanes of traffic and sent up a cloud of dust that obstructed the pursuing officer's vision. Officer Guadalupe Villalobos was unable to stop safely and crashed his patrol car into the guardrail. Had Jeremy driven his semi-trailer truck into the chaos Chagolla created during this emergent situation, or arrived immediately thereafter before things settled down, and a death occurred, a second degree murder charge against Chagolla could potentially be supported. It would then most likely be a question for the jury whether Jeremy's actions combined with Chagolla's to cause the victim's death, thus satisfying the proximate cause element of murder, or whether his actions were a superseding cause. (See *Hill v. Peres* (1934) 136 Cal.App.132.)

But this not what happened. Jeremy's semi-trailer truck arrived 30 minutes later to a situation that had been safely navigated by more than a half-mile of preceding vehicles, including the three vehicles he struck. The forces set in motion by Chagolla's crash had definitively spent themselves out with respect to the near level of certainty required to satisfy the risk element of implied malice murder. In my view, the break in the causal chain between Chagolla's driving and the second accident was not a close call, as it was in *Caldwell*. There was no longer a high enough probability of death sufficient to impose liability for murder at the time of the second accident, as a matter of law. The People thus failed to establish probable cause to hold Chagolla over on a murder charge. I would affirm the dismissal of the second degree murder charge for failure of proof on the element of proximate cause.

## V.

### *No Superseding Cause*

The prosecution also failed to demonstrate that Jeremy's negligence was an intervening concurrent cause. This is not for any reason discussed by the parties, however. The parties put the cart before the horse and mistakenly focus on the law governing superseding causes. The reason Santoya's negligence is not an intervening concurrent cause is that the second accident took place outside the foreseeable scope of risk and after the high probability of death had dissipated to the point where the forces set in motion by Chagolla had come to rest in a position of apparent safety. As a consequence, there was no foreseeable or continuing cause in fact that could combine with Santoya's grossly negligent acts.

"To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and extraordinary occurrence. . . . The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*People v. Crew* (2003) 31 Cal.4th 822, 847, citation omitted.) Thus, "the general rule [is] that no criminal liability attaches to an initial remote actor for an unlawful killing that results from an independent intervening cause (i.e., a superseding cause). In contrast, when the death results from a dependent intervening cause, the chain of causation ordinarily remains unbroken and the initial actor is liable for the unlawful homicide." (*Cervantes, supra,* 26 Cal.4th at pp. 868–869.)

Chagolla contends the second degree murder charge was properly dismissed, because the evidence adduced at the preliminary hearing demonstrated that Jeremy's negligence was an independent, superseding

force that was the sole and exclusive cause of the victim's death. The People contend that "Chagolla's liability should not be excused because [Jeremy] was not an independent intervening cause; he was a dependent one."

Both parties fail, however, to address the foundational question of whether there was a continuing cause in fact at the time of the second accident for Jeremy's actions to act upon. Because the high probability of death created by Chagolla's driving had dissipated to the point where it was no longer an operative cause in fact for purposes of murder liability, there was no operative cause for Jeremy's actions to combine with. As noted, a cause will be considered a concurrent cause in fact only if it was (1) " ' "operative at the time of the death," ' " and (2) " ' "acted with another cause to produce the death." ' " (*Sanchez, supra,* 26 Cal.4th at p. 847.) Nor can the second accident be said to have been within the foreseeable scope of risk for finding Chagolla guilty of implied malice murder in the first place.

The People are correct that the risk of harm in general terms was foreseeable under the test that is used to assess intervening acts. As explained by our high court, "Drivers are supposed to control their vehicles and keep them on the traveled roadway, but common experience shows they do not always do so. Freeway drivers may be intoxicated, distracted, blinded by the weather or sun, sleepy or sick, and for any of these reasons or others may drive off the roadway." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 775.)

On the other hand, Chagolla is correct that a person's negligence or criminal negligence can so dominate the cause of an accident that it constitutes the sole proximate cause. Jeremy was speeding while operating an 18-wheeler semi-trailer truck and took his eyes off the road for a manifestly reckless amount of time to search for his sunglasses. (See

*People v. Lett* (1947) 77 Cal.App.2d 917 [a driver taking his eyes off the road and continuing to drive in the face of a blinding light can lead to manslaughter charges].)

Had the second accident occurred during the emergent circumstances or immediate aftereffects of Chagolla's crash into the guardrail, before traffic stabilized and before police had control of the scene, the question of a supervening cause would likely be one for the jury. But, as I have explained, the second accident was not within the foreseeable scope of risk, and it occurred after the high probability of death had dissipated and there was no longer an operative cause for purposes of implied malice murder.

This lack of an active, continuing cause in fact is what most distinguishes the instant case from *Brady*, *supra*, 129 Cal.App.4th 1314, the main case relied upon by the People.[7] There, the defendants were charged with recklessly causing a fire that resulted in the death of two firefighter pilots who "respond[ed] to a fire that broke out near [their] methamphetamine laboratory in a wooded area." (*Id.* at p. 1318.) The pilots crashed into each other while one of them was descending toward the active fire for a fire retardant drop. (*Id.* at pp. 1318–1319.) The defendants

---

[7]   *Brady* is also distinguishable because implied malice murder was *not* at issue. The jury acquitted the defendants of implied malice murder. (*Brady, supra,* 129 Cal.App.4th at pp. 1318, 1323.) Rather, the conviction challenged on appeal was a violation of Penal Code section 452, namely recklessly starting a fire that caused great bodily injury to a firefighter. (*Brady*, at pp. 318, 1323; §§ 452, 452.1, subd. (a)(2).) Because the "high probability of death" risk element was not at issue in the fire charge, the *Brady* court appropriately relied directly on civil law principles of foreseeability and scope of risk, with no modification, to assess the numerous proximate cause issues raised by the parties there. (See *Brady*, at pp. 1324, 1333–1334.)

asserted the crash was a superseding cause for several reasons, which the court addressed in detail. (*Id.* at pp. 1333–1334.)

*Brady*, however, is inapposite for the foundational reason that the crash in *Brady* took place while there was a foreseeable and actual continuing cause in fact, while here, in the instant case, there was not. The charging statute prohibited "causing a fire that causes great bodily injury" (Pen. Code, § 452, subd. (a)), and the fire started by the defendant was indisputably an active and continuing cause at the time of the crash. The firefighters crashed while they were trying to put it out.

Whereas, here, the high probability of death created by Chagolla's driving had dissipated by the time of the second accident to the point where there was no cause operative at the time of the victim's death. With no active force presenting a high probability of death, Jeremy's negligence could be neither a dependent nor superseding cause. The second degree murder charge against Chagolla was properly dismissed.

## VI.

### *Conclusion*

For all of these reasons, I concur with but do not join the majority's opinion as it relates to the second degree murder charge.


DO, J.